**CYBERCHRON CORPORATION,**
Plaintiff,

v.

**CALLDATA SYSTEMS DEVELOPMENT,**
INC., Defendant.

No. CV 90–4358 (ADS).

United States District Court,
E.D. New York.

Aug. 30, 1993.

Wickwire Gavin, Vienna, VA (Jeffrey G. Gilmore, L. James D'Agostino, of counsel), for plaintiff.

Shea & Gould, New York City (Richard L. Spinogatti, Darlene Fairman, of counsel), for defendant.

James M. Black, III, Corporate Atty., Bethpage, NY, for Grumman Corp.

## MEMORANDUM AND ORDER

SPATT, District Judge.

In this case involving the manufacture of "ruggedized" computer equipment, two crucial issues are presented. First, was there a valid contract entered into between the parties, and, if so, was there a breach by one or both of the parties, and, if so, what damages were incurred? Second, if no valid agreement was consummated, is the plaintiff entitled to recover under either the doctrine of quantum meruit or promissory estoppel?

## BACKGROUND

The plaintiff Cyberchron Corporation ("Cyberchron" or the "plaintiff"), a New York corporation, is engaged in the business of providing customized computer hardware for military and civilian use. The defendant Calldata Systems Development Inc. ("Calldata") is a Florida corporation and a subsidiary of Grumman Data Systems Corp. ("Grumman"). In this decision, except where otherwise indicated, the Court shall refer to the defendant Calldata as "Calldata," "Grumman," or "the defendant". Grumman had a contract with the United States Marine Corps to build a combat command control system, which included providing containers for high-tech computers. The equipment at issue is a "rugged computer work station" designed to operate under rough military and combat conditions in a command center. This equipment consisted of three units, a video processor, a work station and a color monitor. (See Plaintiff's Exh. 42—photographs of the equipment). This "ruggedized" computer equipment was to be used by Grumman in a Marine Corps defense program known as the Advanced Tactical Air Command Central ("ATACC"). The ATACC was designed to be a "lightweight compact easily deployed advanced version of the U.S. Marine Corps Tactical Air Command" (Plaintiff's Exh. 1, p. 103431).

During the years 1989 and 1990, the parties were involved in extended negotiations as a result of which Cyberchron attempted to produce this "ruggedized" computer equipment. It is undisputed that although some equipment was produced by the plaintiff, no such equipment was actually delivered to Calldata or Grumman, nor was any payment made to the plaintiff. As a result, this lawsuit evolved.

## THE PLEADINGS

The first amended complaint sets forth three counts or causes of action requesting monetary damages, based on the following grounds: (1) breach of contract, (2) quantum meruit and (3) promissory estoppel.

In addition to denials and nine affirmative defenses, the answer of the defendants interposes a counterclaim for breach of contract, for which Grumman seeks money damages.

## THE TRIAL AND FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (see also Colonial Exchange Ltd. partnership v. Continental Casualty, 923 F.2d 257 [2d Cir.1991]).

During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

As a result of a contract between Grumman and the United States Marine Corps involving ATACC, Grumman sought to obtain "ruggedized" or "toughened up" computer equipment. This computer equipment was to be modified to enable it to withstand rough battlefield conditions. Cyberchron was a firm in the business of "ruggedizing" computer equipment. At the center of the controversy between the parties was the continuing dispute over the weight of the three pieces of computer equipment which formed the "rugged computer work station," namely: (1) a video processor, (2) a work station, and (3) a color monitor.

The long and tortuous paper trail in this case starts on November 7, 1989 with the issuance by Grumman of an "Invitation to Quote—Not an Order" ("ITQ") (Plaintiff's

Exh. 1) to Cyberchron and four other companies. The ITQ requested "a firm-fixed-price proposal for 55 units of the ruggedized hardware components." The Court notes that of the twelve Performance Objectives set forth in the ITQ, the "size, weight and cost" element was the second most important.

At this juncture, to place the issue of the weights in proper perspective, the Court finds that the weight of the ruggedized equipment was a critical part of the ATACC program and was a material term of the proposed agreement between the parties. Grumman ATACC Program Director Edwin A. Mitchell, a twenty-year Army veteran who had very little contact with Cyberchron, testified that the ATACC Center directed the air combat tactics of the Marine Air Corps from four shelters containing the work stations. Air battles would be controlled from these shelters. Mitchell testified that the weight of the work station "was pretty critical to the program ... because we had the weight limit on the shelters ... so it was a concern to me, yes." (Tr, at p. 949 [1]).

Cyberchron responded to the Grumman ITQ by an undated proposal transmitted on or about December 1, 1989 (Plaintiff's Exh. 2). Cyberchron proposed a video processor and work station of 48 pounds each with a monitor weighing 50 pounds, for a total weight of 146 pounds for the three units.

Following this response by Cyberchron, the parties engaged in many discussions. On February 2, 1990, the defendant submitted to Cyberchron a list of technical questions (Plaintiff's Exh. 3). Included in the questions was a request for "the total weight of your workstation processor ...? video processor?" and "the total weight of your monitor ...?"

The plaintiff responded to the questions on February 13, 1990 (Plaintiff's Exh. 4). As to the weights, the plaintiff stated:

| | |
|---|---|
| Video processor | 30 lbs. |
| Workstation and monitor | 100 lbs. |
| TOTAL: | 130 lbs. |

Elsewhere in the response to the technical questions, the plaintiff stated that "the total weight of the monitor is approximately 70 pounds."

As to the proposed contractual status between the parties, the plaintiff stated:

"CYBERCHRON is willing to act upon a letter of intent, letter contract or other contract vehicle to proceed with the commercial deliveries, if this will minimize the schedule impact for the Grumman ATACC program." (Plaintiff's Exh. 4 at p. 300396).

Certainly, as of February 13, 1990 when the plaintiff responded to the defendant's technical questions, the parties were still negotiating and there was no agreement between them.

However, by March 1, 1990 the parties apparently agreed on prices. In a letter to Grumman dated March 1, 1990 (Plaintiff's Exh. 5), the plaintiff confirmed a series of prices, including the total price of $1,383,-879.00. This letter also set forth certain delivery dates "subject to receipt of Grumman PO NLT March 30."

Notwithstanding the apparent agreement on price, the question of the weights continued to present a problem precluding agreement by the parties. On April 20, 1990, they apparently started negotiations anew when Grumman issued a second "Invitation to Quote—Not an Order" ("ITQ2") (Plaintiff's Exh. 6). In this ITQ2, among other things, Grumman requested that Cyberchron "specify weight limits for the equipment." The ITQ2 also provided that "the total combined weight of one Monitor plus its associated Workstation, including all peripheral devices (except the digitizing tablet) and all directly attached mounting brackets, shall not exceed 115 pounds."

In addition, in capital letters, ITQ2 contains the following warning:

"FAILURE TO COMPLY WITH THE SPECIFICATION REQUIREMENTS WILL RESULT IN THE EXERCISE OF GRUMMAN DATA SYSTEMS WEIGHT/COST DAMAGE PENALTIES

1. The trial transcript is referred to as "Tr." with the page number also set forth.

ESTABLISHED PRIOR TO PURCHASE ORDER AWARD."

The plaintiff responded to ITQ2 on May 1, 1990 (Plaintiff's Exh. 7) and included a counteroffer as to the weights, as follows:

| | |
|---|---|
| Workstation | 52 lbs. |
| Video Processor | 52 lbs. |
| Monitor | 80 lbs. |
| TOTAL: | 184 lbs. |

According to Howard Paul, Cyberchron Director of Program Management, and the major participant on its behalf, these latter weights were its "best engineering estimate of what we thought the weights would be ... it was a highly customized product and, not having built one before, we could only go with engineering estimates" (Tr. at p. 77).

On May 1, 1990, the same date as it responded to the ITQ2, Cyberchron also submitted a formal proposal to Grumman (Plaintiff's Exh. 8). The proposed cost for materi-al, labor and overhead applicable to providing the equipment was the sum of $1,101,511.34, and the estimated profit or fee was $143,196.50, for a total cost of $1,244,707.84.

Finally, a purchase order was issued by Grumman to Cyberchron on May 15, 1990 (Plaintiff's Exh. 9) which contained the statement that "weight shall not exceed the following:

| | |
|---|---|
| Workstation | 45 lbs. |
| Video Processor | 30 lbs. |
| Monitor | 70 lbs. |
| TOTAL: | 145 lbs." |

As to the weights, the May 15, 1990 purchase order further stated:

"IN THE EVENT DELIVERED PRODUCT EXCEEDS THE WEIGHT REQUIREMENT SPECIFIED, THE PENALTY SHALL BE CALCULATED AS FOLLOWS:

| EXCESS PRODUCT WEIGHT OF: | RESULTING COST PENALTY |
|---|---|
| 1% – 5% | LESS 5% UNIT TOTAL PRICE |
| 6% – 10% | LESS 10% UNIT TOTAL PRICE |
| (greater) > 10% | LESS 25% UNIT TOTAL PRICE |
| (greater) > 25% | GDS RIGHT TO TERMINATE FOR DEFAULT" |

The Court finds that these weight penalties were also a material term of the proposed agreement. Remarkably, this weight penalty provided, for example, that if the weight of an item was six pounds in excess of specification, Grumman could deduct twenty-five percent of the price of that unit.

"THE COURT: So, if it were greater than ten percent of the unit weight, and if the weight is 50 pounds, ten percent is another five pounds; is that correct?

THE WITNESS: (Calvin Wilhelm) Yes.

THE COURT: And if it were 56 pounds instead of 50 pounds, you would deduct 25 percent of the price?

THE WITNESS: That's right." (Tr. p. 748).

So that as of May 15, 1990, the parties not only did not agree on any of the weights of the three units, but the purchase order set forth severe weight penalties, including a 25% reduction in the price and/or default, in the event the plaintiff exceeded the weights set forth by Grumman in the purchase order.

Cyberchron did not agree to the terms of this purchase order. In a letter to Grumman dated May 24, 1990 (Plaintiff's Exh. 10), Cyberchron raised exceptions to the purchase order with regard to (1) delivery dates, (2) pricing, (3) Grumman's termination liability, (4) verification methods, (5) the random vibration profile, and (6) the weights. In particular, with regard to the weights and the weight penalties, Cyberchron stated:

"4) As indicated in a memo from Mr. Don Baker, dated April 20, 1990, the weights for the workstation, video processor and monitor were 52 lbs., 52 lbs., and 80 lbs. respectively. The purchase order however, lists these weights as 45 lbs., 30 lbs. and 70 lbs. respectively. Cyberchron takes exception to the weight specifications imposed by Grumman, and feels that the penalties are excessive and unreasonable. . . ."

The letter ended by requesting Grumman to "Please contact me so that these issues can be resolved in a timely manner." Clearly, as of May 24, 1990, there was still no meeting of the minds on the material terms of the proposed agreement and there was no intent to enter into a binding contract.

After this exchange, it is no surprise that Cyberchron "proceeded with caution and held off buying high dollar items." After additional discussions, Program Management director Howard Paul wrote to Grumman on June 8, 1990 again raising the issues of (1) termination liability, (2) delivery dates, and (3) the persistent weight problem. (Plaintiff's Exh. 11). With regard to the weights, it was stated:

"2. It has always been Cyberchron's policy to meet or exceed system specifications, to the maximum extent possible. As previously mentioned, we believe that the weight penalties noted in the purchase order are excessive and unreasonable. Again, to date, no response has been received from Grumman indicating an adjustment to these penalties, or even a desire to discuss the situation. Please be advised that if Grumman fully intends to keep these penalties as part of the purchase order, Cyberchron has no choice but to seriously reconsider the design aspects of the affected deliverable hardware, and if necessary, sacrifice the integrity of the "ruggedness" in order to comply with the weight specifications. A redesign of the system will drastically affect the present delivery schedule. If this issue is not resolved by June 15, 1990, Cyberchron will begin its redesign phase and subsequently forward a second revised delivery schedule soon after its initial evaluation."

Grumman responded on June 15, 1990 with two communications. In a letter to Paul (Defendant's Exh. G), Grumman indicated the importance of the weights and weight penalty as follows:

*"Equipment Weight;*

The *weight penalty as stipulated in the reference a) Purchase Order is a non-negotiable element of this Purchase Order as overall weight is a major concern to the ATACC Program* and was, after all, a major evaluation criteria in selection of Cyberchron. The following weights shall apply based on Cyberchron's technical proposal:

| | |
|---|---|
| Workstation | 50 lbs. |
| Video Processor | 50 lbs. |
| Monitor | 75 lbs. |

This yields an overall system weight of 175 lbs. inclusive of all peripherals (excluding digitizing tablet). . . . Grumman expects the same level of ruggedness and quality as specified in the subcontract specifications and insists only that Cyberchron now live up to previous commitments regarding the weight issue." (emphasis supplied).

The second document was entitled "Amendment No. 1 to the subject purchase order" (Plaintiff's Exh. 13), which attempted to resolve two of the outstanding issues. Grumman extended the delivery date to August 22, 1990 and increased its termination liability from $200,000 to $700,000. However, Amendment No. 1 did not address the other issues raised by Cyberchron in its letters of May 24th and June 8th, such as the prices, the weights and the weight penalty.

Meanwhile, with regard to the weights, Cyberchron reviewed this matter with its employees to attempt to get down to lower weights (see Plaintiff's Exh. 19). The weights Cyberchron "can do" on June 12, 1990 was a total of 210 pounds, substantially in excess of specification of 145 pounds in the Grumman purchase order or the amended weights of 175 pounds set forth in Grumman's June 15, 1990 letter.

On June 22, 1990, Howard Paul of Cyberchron again wrote to Grumman with regard to the weights (Plaintiff's Exh. 14). The letter was entitled "Suspension of Activities

Relative to Deliverable Hardware," and read as follows:

"*Reference:* Grumman Purchase Order # 84–30624

*As you are aware, Cyberchron will not be able to meet the weight specifications as noted in the referenced purchase order.* In order to fully comply with the associated technical specification (SPEC–ATACC–003–001 dated April 10, 1990), the present weight estimates are as follows:

| | |
|---|---|
| Monitor with touchscreen | − 110 lbs. |
| Workstation | − 65 lbs. |
| Video processor | − 65 lbs. |
| [TOTAL: | 240 lbs. ] |

After a careful analysis, it was determined by our Mechanical Engineering Department that *a significant weight reduction in the hopes of meeting Grumman's requirements, could not be accomplished.*

*Grumman has indicated that these weights, as presented by Cyberchron, are unacceptable. Concurrently, Cyberchron has gone on record as indicating that the penalty for not meeting the Grumman weight requirements, is also unacceptable. Due to the uncertainty and seriousness of this issue, Cyberchron must suspend all procurement, manufacturing and test activities associated with deliverable hardware on this contract until such time that both companies can arrive at mutually acceptable terms.* On a personal note, I regret having to make such a decision. However, I will not allow continuance of a Program that is now facing possible cancellation or forfeiture of significant funds until this risk has been reconciled" (emphasis supplied) (Captioned total weight added).

This was a crucial point in the negotiations. By June 22, 1990 if no agreement on weights and weight penalties was reached, Cyberchron could cease working on the operation and all bets would have been off. On the other hand, Grumman could have agreed to the substantially greater weights proposed by the plaintiff and the parties could have entered into an enforceable agreement. Neither event occurred.

Instead, in a significant document, Grumman tried to push Cyberchron into completing the order without an enforceable agreement and with unresolved material terms. By letter dated June 26, 1990 (Plaintiff's Exh. 15), Grumman "insisted" that Cyberchron proceed with the work and satisfy the "contractually binding obligations," as follows:

"As discussed during our conversation of June 24, 1990, Grumman is very concerned with Cyberchron's unilateral stop work on the subject program, as presented by reference c), as well as the situation regarding the technical approach to the program specifically with regard to the weight of the units.

*The weights reflected in the reference c) Cyberchron letter not only exceed the specification requirement but also show significant growth from the weights represented by Cyberchron in various technical documentation* and the reference f) acknowledge of the reference a) Grumman Purchase Order. The current Grumman concern is that Cyberchron has seriously misrepresented the circumstances regarding weight of the units both prior to and after award of this subcontract and this situation lends suspicion as to what other elements of the specification may not be adhered to at the time of equipment delivery.

*Grumman holds Cyberchron responsible to deliver qualified units on August 22, 1990 in accordance with the terms of the reference a) Purchase Order as clarified by the reference d) Grumman letter.* Grumman in no way recognizes Cyberchron's unilateral stop work as presented by reference c) and *insists that Cyberchron endeavor to proceed with work and satisfy the contractually binding obligations* to provide qualified equipment.

In hopes of resolving outstanding technical difficulties, Grumman intends to visit Cyberchron on Thursday, June 28, 1990." (Emphasis supplied).

Notwithstanding the strong language in the Grumman June 26, 1990 letter referring to "contractually binding obligations," the Court finds that on that date, Grumman had no legal right to hold Cyberchron responsible for anything. There was no binding agreement between the parties, and no obligation

to produce on the part of Cyberchron. However, the letter did serve to exert pressure on Cyberchron to complete work on the ruggedized equipment, regardless of the failure to agree on the material terms. Notwithstanding the impasse, Calvin R. Wilhelm, the Grumman Manager of Procurement "insisted" that Cyberchron continue to work to produce the equipment:

"Q   And in fact you insisted that Cyberchron continue working?

A   Absolutely." (Tr. at p. 808).

On June 28, 1990, representatives of the parties met. Again, the overriding issue discussed was the problem concerning the weights. In his handwritten notes (Plaintiff's Exh. 16), Paul wrote:

"Weight: real weight problem (they have a weight penalty [$500,000] also) ... Workstation and V.P. is now 59 pounds Monitor: 108 pounds ...

(They agree) Workstation can't be changed. Monitor will have to be redesigned. A new cheaper design would weigh 90–95 lbs.... They will revise the weight penalty based upon the new weights they—agree to:

*Action Items* ... (2) New weights due on 7/2 and delivery impact ..."

On June 29, 1990, Gerald Glinka, Grumman Business Manager, wrote an interoffice memorandum to (Plaintiff's Exh. 62) Wilhelm reporting on the June 28, 1990 meeting as follows:

"To reiterate, the main issue was equipment weight's (sic) of 65–65–110, (W.S., V.P., Monitor) those weight's (sic) being forwarded to Grumman via Cyberchron letter dated June 22, 1990. *Grummans (sic) position was and remains that these weights are unacceptable, noncompliant and absurd*" (emphasis supplied).

Despite the failure to agree on the weight problem, among other items, Cyberchron continued to work on the project. By this time, the weights estimated by Cyberchron were as follows:

| | | |
|---|---|---|
| Workstation | 59 | lbs. |
| Video Processor | 59 | lbs. |
| Monitor | 108 | lbs. |
| TOTAL: | 226 | lbs. |

At the conclusion of the June 28, 1990 meeting, the parties agreed that the plaintiff would give the defendant "in writing our best possible weight reductions, and our finalized weight, by I believe July 2 ... (and) they would respond to us by July 6th." (Tr. at p. 106).

By letter dated July 2, 1990 (Plaintiff's Exh. 17), the plaintiff notified the defendant of the new weights and delivery schedule, in the following manner:

"In an effort to continue working with Grumman to solve the overall weight problem, and to improve specification outages, Cyberchron respectfully proposes the following revised weights:

| Item | Previous Weight | New Weight | Delivery |
|---|---|---|---|
| Workstation | 65 | 59.0 | August 22 |
| Video Processor | 65 | 58.5 | August 22 |
| Monitor | 110 | 95.5 | September 30 |
| Total | 240 | 213.0 | |

One of the action items which arose from the referenced meeting was for Grumman to indicate to Cyberchron by July 6, 1990, if the above weights are acceptable. In order to comply with the above proposed delivery dates, formal direction (including a revised weight spec) must be received by that date." (totals supplied).

These were the final weights submitted by Cyberchron, namely 59.0, 58.5, 95.5, totaling 213 lbs. These weights were never accepted by Grumman. As to the weight penalty, Grumman Manager of Procurement Wilhelm testified that "if the plaintiff produced the equipment and delivered ... the penalty would be in excess of $300,000." (Tr. at pp. 775–776).

Grumman responded by letter dated July 11, 1990 from Leslie–Ann LaFon, Senior Subcontract Administrator, (Plaintiff's Exh. 18) and seemingly accepted the last Cyberchron weight schedule of 59, 59 and 95.5. This "acceptance" lasted only two days. During this two-day hiatus, neither party took any action in reliance on the LaFon letter.

By letter dated July 13, 1990 (Plaintiff's Exh. 20), Grumman rescinded its acceptance of the Cyberchron weight schedule as follows:

"Cyberchron is hereby advised that the reference d) GDS acceptance of Cyberchron proposed weights is rescinded.

Resolution of the unit weight issue must be part of the Purchase Order definitization negotiations. GDS suggests that these negotiations be conducted at the GDS McLean Virginia facility on Friday July 20, 1990."

Other problems continued to prevent agreement. In a letter dated July 27, 1990 (Plaintiff's Exh. 21), Cyberchron requested an increase in Grumman's maximum termination liability from $700,000 to $1,000,000 in order "to continue performance" and "maintain previously established program objectives." This request was denied by Grumman in a July 30, 1990 letter (Plaintiff's Exh. 22). As the July 30, 1990 letter clearly indicates, there was still no agreement between the parties:

"... negotiations to fully definitize the reference a) Purchase Order have been set for August 8, 1990.

In the reference c) Cyberchron letter, a request has been made for an increase to the termination/liability limitation currently set in the reference b) Purchase Order Amendment by the amount of $300,000. Such an increase would nearly fully fund the subject Purchase Order and is therefore not justified in light of the proximity of the pending negotiations.

. . . .

Needless to say, GDS is reluctant to issue such an Amendment given the fact that full definitization is expected to occur so soon.

Please modify the Cyberchron request at the earliest opportunity and contact the undersigned with any further inquiries regarding this matter."

During this period, in mid-July 1990, Grumman's Wilhelm made a meaningful promise and representation to Cyberchron. He directed Howard Paul to proceed "as if the new set of weights was approved ... and we would work out the definitization of the purchase order later." (Tr. at p. 245). By July 27, 1990, according to Paul, Cyberchron had already expended approximately $700,-000 on this work assignment.

In early August 1990, Paul made a handwritten note for the file (Plaintiff's Exh. 23). On the top of the page he wrote: "Right now, there is no contrac" (sic). The Court agrees. Nevertheless, the parties plodded onward. By this time, however, in a crucial change in the factual scenario, Cyberchron had been given certain assurances that if it did the work, the terms would be worked out.

Another meeting was arranged for August 8, 1990 to review all the problems. According to Paul, there were "many serious problems associated with this purchase order that have not been resolved ... in my mind we didn't have a contract.... all I got were obstacles and lack of response." (Tr. at 116). These problems also included serious price disagreements. Nothing was resolved in the August 8, 1990 meeting. The Court finds that as late as August 8, 1990, some nine months after the initial ITQ was sent to Cyberchron, there was no enforceable agreement between the parties.

In an August 9, 1990 interoffice memorandum from Paul to Cyberchron President Fadden (Plaintiff's Exh. 29), Paul discussed the inability to agree on material terms and that:

"Negotiations concluded without a resolution to the weight specifications, weight penalty, additional termination liability or NTE pricing on this contract."

Prior to and during this period, Grumman again applied pressure on Cyberchron to proceed, notwithstanding the failure to agree. Paul testified as follows:

"A  I think I want to correct something I said before. The fact about weights, I was told by Calvin Wilhelm, I guess around the middle of July, that we should proceed as if the weights were approved. And I was naturally reluctant.

I said to him are you willing to put this in writing?

He said no.

I said, what do you mean no?

He said, well, I am not putting it in writing, but you guys have to proceed.

I said that's a problem.

. . . .

So, I stuck to my guns, so to speak, and I said we are not proceeding until you put it in writing.

After an enormous amount of pressure from himself, Glinka and Cotellessa and the whole project team at Grumman, later that month said we will do it finally. If *I have your assurance that we will resolve the issues in the very near future almost immediately we should proceed—we will proceed.*

*He said you should proceed.*

Q Were any of the issues, though, ever resolved?

A No." (Tr. at pp. 119–120). (Emphasis supplied)

Grumman Manager of Procurement Wilhelm himself confirmed that he expected Cyberchron to deliver the equipment. (Tr. at p. 777). Wilhelm's testimony clearly reveals that he continued to pressure Cyberchron to manufacture and deliver the equipment:

"Q Now, did you have any discussions with Howard Paul after that (June 28) meeting?

A Many times.

. . . .

Q You told him to continue manufacturing pending further negotiations, didn't you?

A We insisted that they perform according to the contract, yes.

Q Did you tell him to continue manufacturing?

A *We insisted on continued performance.* That's part of the process.

. . . .

Q The unresolved issues which were outstanding at that point in time?

A As far as I was concerned there was no unresolved issues other than price.

Q Well, did you expect him to continue performing subject to the unresolved price issue?

A Yes.

Q And to the extent that there were any other unresolved issues you expected him to continue performing; is that correct?

A I don't know what they might be.

Q Did you expect him to continue performing on it nonetheless?

A I expected him to perform to his contract as agreed" (Tr. at pp. 866–867) (emphasis supplied).

As late as the August 8, 1990 meeting Wilhelm told the Cyberchron people that he expected them to deliver equipment. (Tr. at p. 878). After the August 8, 1990 meeting, his superior Robert C. Drost, Grumman Director of Material, took over the Cyberchron negotiations.

The sparring continued. On August 10, 1990, Grumman wrote to Cyberchron (Plaintiff's Exh. 30) requesting "cost and pricing data ... by the close of business Friday, August 31, 1990...." On August 16, 1990, Grumman again wrote "in an effort to conclude negotiations" emphasizing "that this correspondence in no way authorizes the initiation of any work regarding this effort and only serves as one potential element to resolve the negotiation gridlock." (Plaintiff's Exh. 16).

Verbally, off the record, Grumman was directing and insisting that Cyberchron perform, but in writing, on the record, it did not authorize "the initiation of any work." It is obvious, and the Court finds, that at the same time the defendant negotiated to reach an agreement and advised Cyberchron "on the record" that it was not authorized to do "any work regarding this effort", the defendant was orally pressuring the plaintiff to do the work. Further, Grumman assured Cyberchron that if it did the work, the negotiation problem could be resolved.

As Paul testified, the "off the record" attempts by Grumman to push Cyberchron into doing the work continued:

"Q Did you have any further discussions with any Grumman or Calldata personnel after the August 8th, 1990 meeting?

A There were constant discussions between myself, Joe Cotellessa, Calvin Wilhelm, Gerald Glinka, everybody singing pretty much the same song. You got to get us equipment as soon as possible. You are going to be late, we are late, whatever the case may be. You should be proceeding as if the weights were approved.

. . . .

Here I am getting conflicting signals with no resolution to the weight issue, but everybody telling me you have to keep producing and we have to get the equipment. *And the pressure was enormous, I was getting three, four phone calls a day from various members of their staff."* (Tr. at pp. 125–126) (emphasis supplied)

It is clear that as late as August 28, 1990, well after the purported Grumman imposed delivery date of August 22, 1990, the parties had not arrived at an agreement as to material terms. There was no intention to be bound on either side. This is confirmed by Drost, Director of Materials of Grumman and Calldata, when he discussed the situation with Paul prior to August 28, 1990:

"Q Can you please relate to me the general discussion which was held?

A The first time we spoke was in regard to an agreement to disagree between Calvin and Mr. Paul in regard to the attempt to definitize the price on the subcontract. And I wanted to inject myself into the stand off between the two to see if there was a way we could cool down the situation because they appeared to be angry with each other, and there was no continuance of the negotiation." (Tr. at p. 388).

If there was any doubt as to the failure to agree, it was clarified by the testimony of Drost, clearly indicating that the parties never agreed on the material terms of this contract or subcontract, as Grumman referred to it:

"Q To clarify, Mr. Drost, you are talking about the undefinitized subcontract?

A Not to exceed subcontract, yes.

Q And that was never definitized?

A As to price, yes.

. . . .

Q Please read that sentence out loud.

A The inability to finalize the purchase order is principally centered as you acknowledge in your letter on the issue of mutually acceptable weight penalties.

Q So, this is—this was a statement you made in your letter; is that correct?

A Yes.

Q *And that in fact is accurate? There was a failure to arrive at mutually agreeable weight penalties?*

A *Yes.*

Q *And there was also a failure to arrive at mutually agreeable weights; is that correct?*

A *Yes.*

. . . .

Q *Mr. Drost, would you agree with me that the weight penalty and weight terms of this purchase order are material or important terms of a purchase order?*

A *Yes."* (Tr. at pp. 403, 404 and 451). (Emphasis supplied)

Another Grumman official, Gerald Glinka, the Business Manager, also testified that no agreement was ever reached as to the weights:

"Q And the weight penalties in this procurement remained at all times as originally set forth in the purchase order, namely, 30, 45 and 70 pounds?

A Yes, that's correct.

Q If I may refer you to Exhibit 20. Do you have that in front of you?

A Yes, I do.

Q And you have seen this letter before?

A Yes, I have.

Q And directing your attention to the third paragraph, would you please read the first sentence.

A Resolution of the unit weight issue must be part of the purchase order definitization negotiations.

Q *And am I correct, Mr. Glinka, that the purchase order was never definitized?*

A *Yes, you are correct, we never completed negotiations."* (Tr. at p. 1021). (Emphasis supplied)

Again, as to the necessity to agree on the weights, Richard Cartwright, a Grumman Production Manager of the ATACC Program, testified: "If I was in Cyberchron's place, I would certainly have tried to reach an agreement with Grumman concerning weight." (Tr. at p. 1209).

On August 28, 1990, the parties again met, and this time Grumman brought along an attorney. Grumman's representatives stated that Cyberchron was "late" and "need(s) to keep performing" (Tr. at p. 131). In fact, even after the Grumman imposed delivery date of August 22, 1990, Drost "insisted" that Cyberchron "continue to manufacture these goods" (Tr. at p. 361):

> "Q As of August 28th in your meeting with Cyberchron, you expected Cyberchron to *continue manufacturing the goods* that are the subject—
>
> A They had an obligation to, yes.
>
> Q You insisted in fact that they continue to manufacture these goods in their best possible schedule?
>
> A They had an obligation to.
>
> Q Can you please answer my question.
>
> . . . .
>
> A Yes." (Tr. at pp. 361–362).

Not only did Drost insist that Cyberchron continue to manufacture the goods without a contract but, significantly, he expected the plaintiff "to continue to incur labor costs, material cost and engineering cost *after* August 31, 1990." (Emphasis supplied) (Tr. at p. 390).

Further, and crucial to the "promissory estoppel" issue is the admission by Drost that Cyberchron would be paid for the work Grumman was insisting it perform, even though no contract had been agreed upon, as the following testimony indicates:

> "Q But, in fact, you wanted him to continue performing, did you not?
>
> A I can't answer yes or no there. That's implied.
>
> Q You didn't tell him to stop, did you?

A No.

Q So you say it is implied. Implied that you expected him to continue performing?

A Yes. He had that responsibility and obligation.

Q *And also implied in that is the implication that he would be paid for what he did, correct?*

A *One can assume that."* (Emphasis supplied) (Tr. at p. 392).

Following the August 28, 1990 meeting, a delivery schedule was sent to Grumman (Plaintiff's Exh. 31) containing delivery dates later than the Grumman imposed August 22, 1990 date. Grumman urged them to "continue to proceed."

It then became apparent to Grumman that the plaintiff could not deliver the equipment until late September or October 1990. Following the August 28, 1990 meeting, Joseph Cotellessa, a Grumman Senior System Architect wrote an interoffice memorandum (Defendant's Exh. M) dated August 29, 1990, which reads in part as follows:

> *"Manufacturing status.* I consider it unlikely that Cyberchron will have any processor units ready for shipment before 7 September (21 September for all 30 processor units). I also consider it unlikely that any monitors will be ready for shipment before 28 September (19 October for all 25 monitors). These estimates are for the best of circumstances; actual deliveries are likely to be later by up to three weeks.
>
> a. Cyberchron had promised a detailed manufacturing/test/delivery schedule to Glinka and Wilhelm by 11 August. I repeated the request, and was informed that Grumman could not have such a schedule until 31 August."

By late August 1990, Cyberchron was well along in the manufacturing and assembly process, estimated by Paul to be 75 to 90 percent completed. Drost of Grumman assured Paul that "everything would be fine" but that Cyberchron had to "keep pushing, keep performing ... to maintain the schedule." (Tr. at p. 135).

By letter dated September 5, 1990 (Plaintiff's Exh. 32) Grumman advised the plaintiff

that a proposed alternate deal to resolve the negotiating impasse involving other types of equipment was no longer "viable."

The situation was brought to a head by Grumman in its September 6, 1990 "Show Cause Notice" to the plaintiff (Plaintiff's Exh. 34). Complaining that Cyberchron "has not delivered the supplies ordered" under the Purchase Orders, Grumman stated that it was "considering termination of the Purchase Order under the provisions of default of the subcontract." Cyberchron was given ten days to present "facts bearing on this question." In a state of shock, Paul called Drost who said the notice was a "formality. I shouldn't be over concerned with it." (Tr. at p. 140).

Drost himself confirmed that, notwithstanding the Show Cause Notice, he told Paul "to continue to perform," stating that the notice was a "formality." (Tr. at pp. 407, 408). The Court finds that even after the Show Cause Notice was served, Drost, Grumman's employee in charge, was orally advising Cyberchron to ignore the notice and to continue to perform. The Court finds that Drost was a hostile and evasive witness, and that his admissions under oath are meaningful.

On September 7, 1990, Cyberchron prepared an elaborate, detailed delivery schedule (Plaintiff's Exh. 35), proceeding under the direction of Drost to Paul "to continue to proceed and to maintain our best possible delivery schedule; which was this." (Tr. at p. 142). Paul formally responded to the September 6, 1990 "Show Cause Notice" in a letter dated September 13, 1990 (Plaintiff's Exh. 36), in which he detailed the persistent continuing problems which precluded a contractual relationship, including the following:

"1) Not having a fully negotiated FFP Purchase Order

2) Acceptable resolution of weight penalty issues

3) Lack of direction regarding acceptable weights

4) Lack of sufficient termination liability funding."

At this point, apparently starting in August 1990, Grumman was already negotiating with two other ruggedizing companies. On September 14, 1990, Grumman entered into a memorandum of understanding with Codar Technology, Inc. ("Codar") to supply the ruggedized work stations at issue. (Defendant's Exh. Z). A written contract with Codar was entered into on September 26, 1990 (Defendant's Exh. AA). Ultimately, Grumman paid Codar approximately $1,602,000 for the ruggedized equipment which Grumman conceded was inferior to the Cyberchron equipment and weighed more, according to Grumman's Cotellessa (Tr. at pp. 1100, 1131).

Having entered into a contract with Codar, Drost wrote to Paul on September 25, 1990, purporting to terminate "the referenced purchase order for default effective immediately." (Plaintiff's Exh. 38). In this termination letter, Grumman referred to the persistent and still unresolved weight problem, as follows:

"The first three [problems] are all intimately related to the weight problem. Any attempt to assign blame to Grumman for issues involving weights is unsupportable. There would be no weight problem but for Cyberchron's blatant misrepresentation in its proposal about the weights of components that it would be delivering. The inability to finalize the purchase order is principally centered, as you acknowledge in your letter, on the issue of mutually acceptable weight penalties.... *The latest estimated weights from Cyberchron are about fifty per cent over the weights stated by Cyberchron in its proposal*" (emphasis supplied).

The relationship between Cyberchron and Grumman then ended. On July 30, 1990, Cyberchron had sent Grumman its first invoice for all work through July 20, 1990 in the sum of $495,207.58 (Plaintiff's Exh. 28) which included costs to the plaintiff in labor and materials of approximately $250,000. No monies were paid by Grumman at any time.

There is no doubt that prior to the termination of the "relationship", Cyberchron had purchased material, performed work, labor and services and produced certain equipment. In fact, on August 28, 1990 Drost himself toured the Cyberchron plant and ob-

served some of the sub-assemblies. (Tr. at p. 394).

It is clear to the Court that Cyberchron performed work, labor and services without an enforceable contract. Cyberchron was "at risk" if it performed and didn't meet the weight specifications. (Tr. at p. 245). While proceeding under these circumstances may be viewed as a naive and possibly foolish endeavor—or perhaps the actions of a company impressed with the importance of retaining a prominent customer in the defense industry—there is substantial evidence that promises were made by Grumman to induce the performance of this work.

Also, the Court notes that while Cyberchron used the word "contract" on a number of documents (see e.g. Plaintiff's Exhs. 14, 27 and 29), that generic use of the term did not establish that there was in fact an enforceable agreement with Grumman. There was no such agreement.

Adding to the overwhelming evidence that the parties never came to an agreement, Grumman's Robert Drost, the official in charge, also acknowledged that the disputed material issues were never resolved:

"Q And you would agree with me that the issues of price, weight and weight penalty were never resolved prior to termination in September of 1990?

A They were still an issue of negotiation.

. . . .

Q Did Cyberchron ever accept the weights or weight penalties in the purchase order in writing?

A No, not to my knowledge.

. . . .

Q Were you aware at that point in time that the purchase order had not been definitized?

A It was still on a not to exceed basis.
Q Were you aware that it had not been definitized?
A Yes." (Tr. at pp. 355, 356 and 359).

With regard to the proof of damages in this case, initially, the Court notes that even if the parties had negotiated an agreement, there is uncertainty whether Cyberchron would have made a profit on the transaction. This was apparently the view of Christopher Faden, the plaintiff's President and sole stockholder.

Through the testimony of Alexander Elezovic, an accountant who worked on the Cyberchron account since 1988, the plaintiff attempted to prove its general and administrative fixed overhead expenses, which included administrative expense, salaries, rent, and interest for the six months ending June 30, 1993 (Plaintiff's Exh. 43). Through this witness, Cyberchron introduced a "Summary of Costs" with regard to this transaction (Plaintiff's Exh. 44). The dates of the expenditures for materials and labor set forth in the Cyberchron documents in evidence are important, as will be seen later.

Gerald Glinka, a Grumman Business Manager, reviewed progress payments by vendors such as Cyberchron. On or about July 30, 1990 he received, by fax, a progress payment form for Cyberchron for costs through July 20, 1990. This payment form or invoice included material and labor costs in the total sum of $239,446.46 and overhead charges of $379.523.01, for a total charge of $618,969.47.

The Court notes that the claimed Cyberchron general and administrative overhead expenses are approximately $140,000 more than the direct labor and material charges. Cyberchron requested payment of 80% of the total charge, or the sum of $495,207.58. Glinka testified that if not for a court order, Grumman would have paid this invoice "as long as it did not exceed the amount with the purchase order" (Tr. at pp. 1010–1012).

### DISCUSSION

#### I. THE APPLICABLE LAW

The first amended complaint contains three counts, each seeking damages in the sum of $1,797,931.70. The first count is based on a breach of contract; the second count is grounded on quantum meruit; and the third count is rooted in the doctrine of promissory estoppel.

Based on the trial record and the findings of fact referred to above and later set forth

in this opinion, the Court will now review the principles of law with regard to each of these counts, based on New York law.

### A. Breach of Contract

■ Even though the Uniform Commercial Code has eased the burden of a party seeking to establish an enforceable agreement, the law in New York remains that no contract exists where the parties do not agree to its material terms, indicating lack of intent to be bound. The essential elements of a contract must be agreed upon and must be reasonably certain.

There is no enforceable agreement where there is a failure to agree on a material term which indicates a lack of intent to be bound. The rule is explained in *Judal Industries Inc. v. Welsbach Electric Corp.*, 138 A.D.2d 573, 574, 526 N.Y.S.2d 154, 156 (2d Dept 1988), as follows:

"[1] For a contract to be enforceable, it must be definite as to its essential terms (*see,* Calamari & Perillo, Contracts § 2–13, at 43 [2d ed]; 21 NYJur2d, Contract § 20).... Although a contract for the sale of goods will not fail for indefiniteness if the parties intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy (*see,* UCC 2–204; *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 973, 395 N.Y.S.2d 151, 363 N.E.2d 701), *when a dispute over essential terms manifests a lack of intention to contract, no enforceable contract results* (*Kleinschmidt Div. of SCM Corp. v. Futuronics Corp., supra,* at 973, 395 N.Y.S.2d 151, 363 N.E.2d 701)" (emphasis supplied).

As stated by then Judge Kaye in *Cobble Hill Nursing Home v. Henry & Warren,* 74 N.Y.2d 475, 482–483, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989), *cert. denied* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990), the basis for the settled principle of law is as follows:

"Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract (*Martin Delicatessen v. Schumacher,* 52

N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541; Restatement [Second] of Contracts § 33 [1981]). The doctrine of definiteness serves two related purposes.

*First, unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy* (*see, Metro–Goldwyn–Mayer v. Scheider,* 40 N.Y.2d 1069, 1070–1071, 392 N.Y.S.2d 252, 360 N.E.2d 930; Restatement [Second] of Contracts § 33[2] [1981] ). This is particularly significant where specific performance is sought. Second, the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement (*see,* Restatement [Second] of Contracts § 33[3] [1981] )" (emphasis supplied).

The Restatement (Second) of Contracts § 33 states that to be enforceable, the terms of a contract must be "reasonably certain," meaning they "must provide a basis for determining the existence of a breach and for giving an appropriate remedy." The standard of definiteness "is necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of the parties" (*Cobble Hill,* 74 N.Y.2d at p. 483, 548 N.Y.S.2d 920, 548 N.E.2d 203).

■ However, to find an enforceable contract, there must be a manifestation of mutual consent to the essential terms so that performance can be rendered reasonably certain and so that the Court can determine whether the contract has been breached.

In the recent case of *Consarc Corporation v. Marine Midland Bank N.A.,* 996 F.2d 568, 574 (2d Cir.1993), the Court of Appeals held that the mere fact that the parties seek to make a more formal written agreement does not prevent an effective agreement, "if the parties have settled on the contract's substantial terms." While a contract can be formed which contains open terms, it must contain the requisite material terms which would allow the Court "a reasonably certain

basis for giving an appropriate remedy" (UCC § 2–204[3]).

■ The defendant places great reliance on the provisions of the Uniform Commercial Code (UCC) to support its position that the failure to agree on the weights and the weight penalties did not prevent formation of an enforceable agreement. The Court disagrees. A good explanation of the effect of the provisions of the UCC with regard to settled common law rules of contract law is found in *Kleinschmidt Division of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 973 395 N.Y.S.2d 151, 152, 363 N.E.2d 701 (1977), as follows:

> "The basic philosophy of the sales article of the Uniform Commercial Code is simple. Practical business people cannot be expected to govern their actions with reference to nice legal formalism. Thus, when there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract (see Uniform Commercial Code, § 2–204). *But, of equal importance, if there be no basic agreement, the code will not imply one.* In this case, it was found as a fact by the trial court, a finding supportable by the evidence and affirmed by the Appellate Division, that there was no basic agreement.
>
> *Without agreement there can be no contract, and, of course, without a contract there can be no breach.* This principle, basic as it is to contract law, finds explicit recognition in the Uniform Commercial Code (§ 1–201, subds. [3], [11]; § 2–204, subds. [1], [2]). The principle should be dispositive of this case" (emphasis supplied).

Here, the parties did not agree on two of the most essential, material and substantial terms of the proposed contract, namely, the weights of the three components and the weight penalties. Without agreement on the weights and the weight penalties, a Court could not determine whether the contract has been performed or breached nor could it

fashion a proper remedy for such an undefined breach.

Time after time, the parties attempted to reach agreement without success. All the witnesses on both sides testified to the materiality and importance of the weights in the ATAAC system and to the total failure to agree on this vital term.

Thus, because Cyberchron and Grumman failed to agree upon the weights of all three components, as well as the penalties associated with those weights upon delivery of a unit or a component, the Court could not determine whether the unit or component complied with the contract. The Court would have no way to determine whether there was a breach and what the applicable remedy, penalty or measure of damages would be. Determining what should be the proper weight or a weight that would comply with the parties intent using the usual "reasonably certain" basis would require sheer speculation on the part of the Court.

Moreover, Cyberchron expressly rejected the weight requirements of Grumman's purchase order. In turn, Grumman expressly rejected Cyberchron's counter offer with regard to the weights. It was clear not only that no agreement on this material term was reached, but that the parties explicitly declined to be bound by the other's offer.

Further, even though there was considerable partial performance by the plaintiff, there was no enforceable agreement and neither party can recover under the traditional "breach of contract" cause of action. (See e.g. *Arcadian Phosphates Inc. v. Arcadian Corp.*, 884 F.2d 69 [2d Cir.1989] ["Since in this case intent can readily be determined by examining the November memorandum, summary judgment was perfectly appropriate even though there was considerable partial performance"]).

For the reasons stated above, the Court finds, as a matter of law, that the parties never agreed upon or entered into an enforceable contract. Accordingly, the plaintiff's first count based on a breach of the contract, is dismissed. Similarly, the counterclaim of the defendant, based upon the same alleged contract, is also dismissed.

## B. Quantum Meruit

Alternatively, in count two of the complaint the plaintiff contends that "by furnishing the additional labor, equipment and materials to Defendant ... Cyberchron has conferred a benefit upon Defendant for which Cyberchron is entitled to be compensated" (Complaint ¶ 22). In count two, the plaintiff relies upon the doctrine of quantum meruit, also known as quasi-contract or unjust enrichment.

■ Initially, the Court notes that the plaintiff can properly plead contradictory claims for breach of contract and for recovery under the theories of quantum meruit and unjust enrichment. *Farash v. Sykes Datatronics,* 59 N.Y.2d 500, 465 N.Y.S.2d 917, 452 N.E.2d 1245 (1983); *Seiden Associates Inc. v. ANC Holdings, Inc.,* 754 F.Supp. 37 (S.D.N.Y.1991).

In *Clark–Fitzpatrick v. Long Island Railroad Company,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987), the rules of law involving quasi-contract were reviewed. First, the existence of a valid and enforceable written contract preclude recovery for quasi-contract. A quasi-contract "is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." (*See also Parsa v. State of New York,* 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 474 N.E.2d 235 [1984]; *Farash v. Sykes Datatronics, supra; Bradkin v. Leverton,* 26 N.Y.2d 192, 197, 309 N.Y.S.2d 192, 257 N.E.2d 643 [1970]).

As stated in *Bradkin,* the principle of law is as follows:

> "Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort. The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy * * * Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of asset, by word or act, on the part of either party involved. The law creates it, regardless of the intention of the parties, to assure a just and equitable result" (*Bradkin v. Leverton,* 26 N.Y.2d at 196, 309 N.Y.S.2d 192, 257 N.E.2d 643).

■ In order to make out a cause of action in quantum meruit, the plaintiff must establish (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation, and (4) the reasonable value of the services. (*Cooper v. Solomon Brothers Inc.,* 1 F.3d 82 [2d Cir. 1993]; *Martin H. Bauman Associates, Inc. v. H & M International Transport, Inc.,* 171 A.D.2d 479, 567 N.Y.S.2d 404, 408 [1st Dept 1991]; *Moors v. Hall,* 143 A.D.2d 336, 532 N.Y.S.2d 412, 414 [2d Dept 1988]; *Umscheid v. Simnacher,* 106 A.D.2d 380, 482 N.Y.S.2d 295, 298 [2d Dept 1984] ).

■ The defendant contends that the doctrine of quantum meruit is related only to the performance of services, rather than the sale of goods, in this case the ruggedized equipment. The defendant further argues that any engineering services performed in connection with the manufacture of the equipment were only incidental or collateral to the sale of the equipment.

Although the cases do mention the word "services" in connection with quantum meruit principles, the Court has found no case that precludes such a recovery in a situation involving the sale of goods, in this instance the ruggedized computer equipment. While most of the cases concern services, some do involve the sale of goods or the rendering of services in connection with the sale of goods. For example, in *Farm Automation Corp. v. Senter,* 84 A.D.2d 757, 443 N.Y.S.2d 765 (2d Dept.1981), the defendant agreed to render services and supply materials in connection with the installation of a silo system on the defendant's farm. *Kremer Construction Co. Inc. v. City of Yonkers,* 73 A.D.2d 639, 422 N.Y.S.2d 752 (2d Dept.1979) involved the sale of "materials ... supplied to the project site." *Monetti S.P.A. v. Anchor Hocking Corp.,* 931 F.2d 1178 (7th Cir.1991) involved a manufacturer of decorative plastic trays. Also, in *G & S Custom Homes Inc. v. Holtz,* 179 A.D.2d 1025, 579 N.Y.S.2d 514 (4th Dept. 1992), although the Court did not rule on the quantum meruit cause because it found an enforceable written contract, the subject matter involved work performed and material supplied. The Court also notes that in the

seminal case of *Farash v. Sykes Datatronics, supra* 465 N.Y.S.2d at pp. 919, 920, 452 N.E.2d at pp. 1247, 1248, in reviewing quantum meruit rules of law, the Court expressly referred to "goods delivered."

■ The defendant raises another defense to the quantum meruit cause, namely, that there has been no actual benefit to the defendant. Since this quasi-contract cause is really based on a legal obligation imposed in order to prevent a party's unjust enrichment, the defendant argues that it did not receive any benefit in that it never actually received a single unit or component of the ruggedized computer equipment.

The law as to receipt of an "actual benefit" was extensively reviewed in *Farash v. Sykes Datatronics, Inc., supra,* a case involving renovations made by the plaintiff to a building not owned by the defendant. In *Farash,* the court stated that the "actual benefit" to the defendant may be less than the value of the plaintiff's performance, may be indirect and may not be a benefit in the economic sense. "Receipt" of a benefit may be a legal concept rather than a physical fact. However, even though the quantum meruit concept does not require the physical receipt of an actual benefit, the defendant must have "received" the results of the plaintiff's performance, in that the plaintiff must have performed on its part. This concept was described in *Farash* as follows:

"A lesson in this area can be taken from Professors Calamari and Perillo: 'The basic aim of restitution is to place the plaintiff in the same economic position as he enjoyed prior to contracting. Thus, unless specific restitution is obtained in Equity, the plaintiff's recovery is for the reasonable value of services rendered, *goods delivered,* or property conveyed less the reasonable value of any counter-performance received by him. *The plaintiff recovers the reasonable value of his performance whether or not the defendant in any economic sense benefitted from the performance.* The quasi-contractual concept of benefit continues to be recognized by the rule that the defendant must have received the plaintiff's performance; *acts merely preparatory to performance will not justi-* fy an action for restitution. 'Receipt,' however, is a legal concept rather than a description of physical fact. If what the plaintiff has done is part of the agreed exchange, it is deemed to be 'received' by the defendant.' (Calamari and Perillo, Contracts [2d ed.], § 15–4, p. 574 [nn. omitted]; see, also, *id.,* § 19–44; Perillo, Restitution in a Contractual Context, 73 Col.L.Rev. 1208, 1219–1225)" (emphasis supplied). (465 N.Y.S.2d at p. 920, 452 N.E.2d at p. 1248).

*Farash* was followed by *Furgang v. Lenefsky, Meier & Novod,* 109 A.D.2d 728, 486 N.Y.S.2d 46 (2d Dept 1985) ("Recovery under a theory of quasi-contract is not dependent upon a promise to pay ... nor can defendant be relieved of this obligation merely because it was the defendant's client who benefitted from the services performed by the plaintiff"); *Long Island Pen Corp. v. Shatsky Metal Stamping Co., Inc.,* 112 A.D.2d 980, 492 N.Y.S.2d 791 (2d Dept 1985) (Since the plaintiffs alleged that they fully performed, their failure to allege an actual benefit to the defendants as a result of plaintiffs' efforts does not warrant dismissal of the complaint).

There is a dichotomy in the cases with regard to the distinction between the actual physical receipt of a benefit by the defendant and the theoretical receipt by virtue of performance by the plaintiff. However, the cases appear to require, at the least, that if there is no actual benefit to the defendant, either someone else receives a benefit or the plaintiff fully performs to such an extent that a theoretical benefit to the defendant arises. Further, the requirement of an unjust enrichment permeates the quantum meruit concept.

In *Martin H. Bauman Associates, Inc. v. H & M International Transport, Inc., supra,* summary judgment was granted to a defendant where no actual benefit was conferred upon the defendant and there was no unjust enrichment. In *Dolmetta v. Uintah National Corp.,* 712 F.2d 15 (2d Cir.1983) a claim of unjust enrichment was dismissed when there was no proof that the defendant was enriched in any manner and that "equity and good conscience" did not require a recovery against the defendant. Also, in *Indyk v.*

*Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir. 1982), it was held:

"The granting of equitable relief lies within the sound discretion of the trial court, so long as that discretion is exercised in accordance with the applicable established precedents. To offset on a theory of unjust enrichment, there must first be enrichment."

(*See also Marilyn Miglin Inc. v. Gottex Industries Inc.,* 790 F.Supp. 1245, 1254, 1255 [S.D.N.Y.1992] ).

The problem with the plaintiff's quantum meruit cause of action is twofold: first, the defendant Grumman was not unjustly enriched by the work done by Cyberchron; second, the defendant failed to receive any actual benefit from the plaintiff's work *and* the plaintiff failed to fully perform on its part. As stated in *Clark–Fitzpatrick,* a quasi-contract is "a legal obligation imposed in order to prevent a party's unjust enrichment." (*See also Miller v. Schloss,* 218 N.Y. 400, 406–407, 113 N.E. 337 [when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another]; *Kremer Construction Co. Inc. v. City of Yonkers, supra* [the defendant was required to pay for materials approved by it and actually supplied to the project site] ).

In this case, the plaintiff failed to deliver or attempt to deliver even a single component of a unit. Further, the plaintiff failed to prove that any of the computer units were fully manufactured and/or assembled prior to the termination of the relationship on September 25, 1990. So that even on the constructive benefit theory, no such benefit was "received" by the defendant.

Here, induced by the defendant's representations, promises and even coercion, the plaintiff purchased materials and expended labor in a lost cause. Some units were assembled in an unknown state of completion. None were delivered nor was any attempt made to deliver. Plaintiff proceeded to work without a contract, taking a chance that there would be an agreement, or at least acceptance of the equipment. Neither event took place.

In view of the lack of any benefit to the defendant, the failure by the plaintiff to fully perform, and the absence of any unjust enrichment by the defendant, neither equity nor good conscience requires the application of the doctrine of quantum meruit. Since there was no unjust enrichment to the defendant nor full performance by the plaintiff, the plaintiff's remedy, if any, is in promissory estoppel but not quantum meruit.

Accordingly, the plaintiff having failed to establish a right to recover under the rules of quantum meruit, the second count in the complaint is dismissed.

## C. Promissory Estoppel

The third count in the complaint is based upon the doctrine of promissory estoppel in that, notwithstanding failure to agree on the weights and weight penalties, the "defendant insisted that Cyberchron proceed with manufacturing equipment called for under the purchase order ... (and) defendant continued to assure Cyberchron that it would accept and pay for the equipment" (Complaint ¶¶ 27, 28). The plaintiff further alleged that it relied upon the promises and assurances of the defendant and so continued to perform, to its detriment.

■ In New York, the doctrine of promissory estoppel, a rule applicable only in the absence of an enforceable contract, has three elements:

1. a clear and unambiguous promise;

2. a reasonable and foreseeable reliance by the party to whom the promise is made; and

3. an injury, in some cases elevated to the requirement of an unconscionable injury (*see, e.g., Philo Smith Co. Inc. v. U.S.–Life Corp.,* 554 F.2d 34 [2d Cir.1977]; *Hoffman v. Boone,* 708 F.Supp. 78, 81 [S.D.N.Y.1989] ), sustained by the party asserting the estoppel by reason of its reliance. (*Arcadian Phosphates Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 [2d Cir.1989]; *Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co.,* 804 F.2d 787, 793 [2d Cir.1986]; *Reprosystem B.V. v. SCM Corp.,* 727 F.2d 257, 264 [2d Cir.] *cert. den.* 469 U.S. 828, 105 S.Ct. 110, 83

L.Ed.2d 54 [1984]; Restatement [Second] of Contracts § 90 [1981] ).

Promissory estoppel is a "narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement". *In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 735 (S.D.N.Y.1989). As succinctly stated in *NCC Sunday Inserts Inc. v. World Color Press, Inc.,* 759 F.Supp. 1004, 1011 (S.D.N.Y.1991):

> "An action for promissory estoppel generally lies when there is no written contract, or the contract cannot be enforced for one reason or another. Thus, it is an action outside the contract. When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract."

■ It further appears that the doctrine of promissory estoppel is applicable to actions involving the sale of goods which are governed by the UCC. (*See Hoffman v. Boone,* 708 F.Supp. 78, 81 [S.D.N.Y.1989] and New York and Federal cases cited at p. 81).

An important case in the field of promissory estoppel, having somewhat related facts, is *Werner v. Xerox Corp.,* 732 F.2d 580 (7th Cir.1984). In *Werner,* the defendant Xerox Corp. sought to improve the process used in manufacturing metal rollers for its copying machines. After a worldwide search for such a manufacturer, Xerox came upon the plaintiff Werner as one of only four manufacturers who were capable of producing the machines and rollers. From April 1978 to November 1979, Werner made phototype rollers and performed development work for Xerox. Contracts were entered into for three machines that were delivered. The lawsuit was in part based on promissory estoppel with regard to the additional work done separate and apart from the contracts to deliver the three machines. The District Court awarded "reliance" out-of-pocket damages for the period prior to July 1979, when Xerox's manager said that the plaintiff "would never make parts for Xerox at this facility." As to the first element, the promise, the District Court determined that the Xerox promises made through their employee Wolf "were more than mere representations regarding what Xerox would do in the future." The District Court found that "Wolf consistently and actually encouraged Werner to set up an off-load supply facility."

The District Court also found, however, that Werner could not reasonably have relied on Xerox's promises after the negative statement by another Xerox representative in July 1979, referred to above. Therefore any reliance upon Xerox's promises would not have been justified after July, 1979.

The Circuit Court affirmed, ruling that the plaintiff was entitled to "reliance damages" from April 1979 to July 1979. The Court held, in part, as follows:

> "Third, the district court held that injustice could be avoided only by enforcement of Wolf's promise. This determination necessarily requires the exercise of the trial court's discretion [*Hoffman v. Red Owl Stores, Inc.*] 26 Wis.2d [683] 698, 133 N.W.2d [267] 275 [ (1965) ], and we will reverse the court only upon a showing that it has abused that discretion. Here, it was not 'very speculative that the plaintiff has actually suffered from his reliance,' *Silberman v. Roethe,* 64 Wis.2d 131, 144, 218 N.W.2d 723, 729 (1974), but instead Werner incurred substantial detriment in reliance on Xerox's promises. The trial court found that, to his detriment, Werner 'deviated from his usual manner of doing business, ... leased a large facility, [went] into business with the Verheims (sic) and hired an employee, Robert Parr, to work for the newly created corporation.' On the record before us, the court's finding was not an abuse of discretion." (732 F.2d at p. 584).

■ In this case, the Court finds that the plaintiff established all three elements of its promissory estoppel claim. First, there were clear and unambiguous representations, promises, inducements and directions to the plaintiff to proceed, to manufacture, assemble and deliver the ruggedized equipment, notwithstanding the failure to agree on the weights at that time. Further, there were promises that if the plaintiff produced the ruggedized equipment, it would be paid. In effect, Grumman's representatives said, you

must "do the work and we will work out the details in the future" and "you will be paid."

The Court finds that prior to July 15, 1990, there were no actionable promises, representations or inducements made to Cyberchron. The insistence by Grumman to proceed, standing alone, without the promise of acceptance and/or payment, does not suffice.

For example, the June 26, 1990, letter from Calvin Wilhelm, Grumman's Manager of Procurement to Cyberchron (Plaintiff's Exh. 15) was not a clear and unambiguous promise, even though he stated:

> "Grumann hold Cyberchron responsible to deliver qualified units on August 22, 1990 in accordance with the terms of the reference a) Purchase Order as clarified by the reference d) Grumman letter Grumman in no way recognizes Cyberchron's unilateral stop work as presented by reference c) and *insists that Cyberchron endeavor to proceed with work* and satisfy the contractually binding obligations to provide qualified equipment." (emphasis supplied)

In this letter, Wilhelm insisted upon performance under the contract. Even though the parties had not entered into a valid agreement, it was Wilhelm's position that there was a contract and he called upon Cyberchron to perform. Since there was, in fact, no contract, Cyberchron could have ignored his request with impunity. This is not a clear and unambiguous promise to Cyberchron that if it produces the equipment, the details will be worked out and you will be paid, notwithstanding the lack of a contract.

The Court does find that Grumman made enforceable promises under the promissory estoppel doctrine, and lists these promises and inducements chronologically as follows:

1. In mid-July 1990, the Court finds that Grumman's Wilhelm directed Cyberchron's Paul to proceed "as if the net set of weights was approved ... and we would work out the definitization of the purchase order later." (Tr. at p. 245)

2. In mid-July 1990, the Court finds that Paul requested that Wilhelm put the promise in writing and the following colloquy ensued.

"WITNESS: (Paul) So, I stuck to my guns, so to speak, and I said we are not proceeding until you put it in writing.

After an enormous amount of pressure from himself (Wilhelm), Glinka and Cotellessa and the whole project team at Grumman, later that month said we will do it finally. If I have your assurance that we will resolve the issues in the very near future almost immediately we should proceed—we will proceed.

He said you should proceed." (Tr. at p. 120, [names added]).

3. Between August 8, 1990 and August 28, 1990, the Court finds that Paul was involved in "constant conversation" with Grumman's Wilhelm, Cotellessa and Glinka, all of whom demanded that Cyberchron proceed to manufacture and deliver the equipment "as if the weights were approved." Paul testified as follows:

"Q Did you have any further discussions with any Grumman or Calldata personnel after the August 8th, 1990 meeting?

A There were constant discussions between myself, Joe Cotellessa, Calvin Wilhelm, Gerald Glinka, everybody singing pretty much the same song. You got to get us equipment as soon as possible. You are going to be late, we are late, whatever the case may be. *You should be proceeding as if the weights were approved.*

. . . .

Here I am getting conflicting signals with no resolution to the weight issue, but everybody telling me you have to keep producing and we have to get the equipment. *And the pressure was enormous, I was getting three, four phone calls a day from various members of their staff"* (Tr. at pp. 125–126 [emphasis supplied]).

4. On August 28, 1990, after the Grumman imposed delivery date of August 22, 1990, the Court finds that Grumman Director of Material, Robert C. Drost, the Grumman employee in charge, testified that he insisted that Cyberchron continue to manufacture the equipment and he conceded that implicit in his request to produce was a promise to pay.

"Q As of August 28th in your meeting with Cyberchron, you expected Cyberchron to continue manufacturing the goods that are the subject—

A they had an obligation to, yes.

Q You insisted in fact that they continue to manufacture these goods in their best possible schedule?

. . . .

A Yes." (Tr. at pp. 361–362).

. . . .

"Q So you say it is implied. Implied that you expected him to continue performing?

A Yes. He had that responsibility and obligation.

Q *And also implied in that is the implication that he would be paid for what he did, correct?*

A *One can assume that.*" (Tr. at p. 392 [emphasis supplied] ).

Not only was there an implied agreement to pay Cyberchron, but Grumman's business Manager Glinka testified unequivocally, that if not for a court order, Grumman would have paid the first invoice presented to it (Tr. at pp. 1010 to 1012).

The Court finds that these promises were clear and unambiguous statements that regardless of the posture of the contract negotiations, if Cyberchron produced the computer units, the details as to weights would be worked out, the equipment would be accepted and Cyberchron would be paid.

The Court notes the similarity in these promises and inducements to the one involved in *Esquire Radio & Electronics v. Montgomery Ward, supra,* 804 F.2d at p. 793, as follows:

"Similarly, at a meeting of executives and managers from both companies in the early 1970s, Esquire specifically expressed its concern regarding the costs and risks of mounting inventories, and Ward, this time through Senior Vice President Dean Lewis, explicitly advised Esquire not to 'concern yourself about the size of the inventory. We will buy the parts.' In fact, in 1975, Ward's Parts Specialist, Harris Ash-er, *unilaterally* approached Esquire's Sales Vice President, Maffei, to induce Esquire to increase spare parts inventories regarding certain cassette recorders. When Maffei responded that he was concerned about the potential costs of such accumulations, Asher replied, 'I don't know what you are concerned about. We are going to use them.' Certainly these specific, clear and unambiguous statements at the very least 'suffice[d] to create a factual question,' *Dominguez v. Manhattan and Bronx Surface Transit Operating Authority,* 46 N.Y.2d 528, 532, 388 N.E.2d 1221, 1223, 415 N.Y.S.2d 634, 636 (1979), as to whether Ward had promised to repurchase accumulated spare parts during the tenure of the buy-back arrangement. Thus the question of whether there was such a promise was properly submitted to the jury."

In contrast to the clear and unambiguous promises made by Grumman in this case are those at issue in *Ripple's of Clearview, Inc. v. Le Havre Associates,* 88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't.1982) ("the record is devoid of a clear representation"); *R.G. Group, Inc. v. Horn and Hardart Co.,* 751 F.2d 69, 78, 79 (2d Cir.1984) ("any promise was conditional upon the signing of a written contract"); *U.S. West Financial Services, Inc. v. Tollman,* 786 F.Supp. 333, 344 (S.D.N.Y.1992) (the promisee was not obligated to provide the proposed financing until a formal commitment letter was executed and delivered); *Shearson Lehman CMO, Inc. v. TCF Banking and Savings,* 710 F.Supp. 67, 73 (S.D.N.Y.1989) (there was to be no deal until the contracts were actually signed and the obligations of the plaintiff to perform were contingent upon the execution and delivery of the formal documents).

Here there were clear promises and inducements to Cyberchron, regardless of the lack of agreement, to produce the equipment as soon as possible, to expend substantial sums on material and labor, in exchange for the equipment being accepted and payment being made.

As to the second element, the plaintiff did establish that it reasonably relied on the promises, from mid-July 1990 to September

25, 1990 when the relationship was finally terminated. Between those periods of time, it was reasonably foreseeable that if plaintiff performed and produced the units, even if the weights were greater than those set forth in the purchase order, it would be paid. After the September 25, 1990 termination letter, it had to be reasonably apparent to Cyberchron that, despite the repeated promises and inducements, no equipment would be accepted or paid for. Once Cyberchron reasonably should have realized that no units would be accepted, it should have ceased operations.

Prior to mid-July 1990, when no clear and unambiguous promise was made, and after September 25, 1990 when negotiations terminated, any expenditures by Cyberchron were incurred at its own risk. Cyberchron could not blindly proceed and expend money for material and labor without a contract and prior to any enforceable promise, nor could it do so when there was no reasonable likelihood that an agreement would be consummated or that the units would be accepted. So that prior to July 15, 1990, in the absence of any contract or enforceable promise, Cyberchron could not reasonably expect to be paid for any costs expended in this transaction.

As to the third element, the Court finds that Cyberchron was "injured" as a result of these promises, representations and inducements. The Court further finds, on this record, that Grumman's conduct exerting pressure on Cyberchron to produce the units at great expense, and then abruptly terminating the transaction to purchase heavier, inferior equipment at a later date from another company, was unconscionable. At the same time that Grumman was pressuring Cyberchron to produce, with the promise of payment, it was already negotiating with another company to do the work. In fact, Grumman did not receive delivery of the components from Codar until sometime in 1991. Ironically, the Codar equipment was considerably inferior to the Cyberchron units and the final weights were 20 pounds heavier than the minimum weight demanded by Grumman in dealing with Cyberchron (Tr. at pp. 1100, 1131).

As to the standard regarding unconscionability in a promissory estoppel cause, in 3 *Williston on Contracts* (3d Ed.) at p. 801, it is stated:

> "However, the party asserting the estoppel must be prepared to show affirmatively that he has done or omitted to do some act or change his position to his prejudice in reliance upon the representations of the person sought to be estopped.
>
> Actual intent or design to mislead is not, however, essential. There need not be a corrupt motive or evil design; it is sufficient if the circumstances are such as to render it unconscionable to deny facts which the party by his silence or representation has caused the other party to believe in and act upon, and the denial of which must operate as a fraud upon him."

This is one of the rare cases in which the equitable doctrine of promissory estoppel has been made out. Under the doctrine of promissory estoppel, as recognized in New York and applied to the plaintiff's proof, the defendant is estopped from disclaiming the legal effect of its clear and unambiguous assurances which were reasonably and foreseeably relied upon. This Court concludes that under the peculiar circumstances outlined in this decision, it would be unconscionable not to compensate Cyberchron for the direct out-of-pocket losses it incurred due to its justified reliance on Grumman's promises and inducements.

Accordingly, as to the third count, the plaintiff Cyberchron has established all the elements of the doctrine of promissory estoppel and the plaintiff is entitled to "reliance damages" for the period from July 15, 1990, the date of the first enforceable promise, to September 25, 1990.

## II. *DAMAGES*

### A. The Measure of Damages—Promissory Estoppel

The damages recoverable in a promissory estoppel case are sometimes referred to as "reliance damages," namely, the actual expenditures made in preparation for performance or in performing the work which has been induced by the defendant-promisor (*see*

Restatement of the Law of Contract 2d Ed. § 349).

In fact, some courts have ruled that damages in promissory estoppel cases are limited to reliance damages and the trial court has wide latitude in fixing such damages. *Werner v. Xerox Corp., supra,* 732 F.2d at p. 584; *Janke Construction Company, Inc. v. Vulcan Materials Company,* 527 F.2d 772, 780 (7th Cir.1976); *Harry Alter Co. v. Chrysler Corp.,* 285 F.2d 903, 907 (7th Cir.1961). (*See also Budget Marketing Inc. v. Centronics Corp.,* 927 F.2d 421 [8th Cir.1991] [Promissory estoppel supports an award of reliance damages] ).

In the Second Circuit, generally, in the absence of special circumstances, a plaintiff is entitled "only to its out-of-pocket expenses rather than to benefit-of-the-bargain damages." (*See Arcadian Phosphates, Inc. v. Arcadian Corp., supra,* 884 F.2d at p. 73; *Esquire Radio & Electronics v. Montgomery Ward, supra,* 804 F.2d at pp. 793–795 [affirming jury award of out-of-pocket expenses under New York Law]; *Palandjian v. Pahlavi,* 614 F.Supp. 1569, 1581–1582 [D.Mass. 1985], *app. den.* 782 F.2d 313 [1st Cir.1986] [equity requires only out-of-pocket award]; *R. Renaissance Inc. v. Rohm & Haas Co.,* 674 F.Supp. 591, 595–596 [D.Ohio 1987] [recovery under promissory estoppel claim cannot include lost profits under Ohio law] ).

In this case, under the circumstances as outlined above, equity requires and it would be unconscionable not to compensate the plaintiff for the actual out-of-pocket losses it incurred as a result of its justified reliance on Grumman's oral inducements, directions and promises during the period from July 15, 1990 through September 25, 1990, *Elvin Associates v. Franklin,* 735 F.Supp. 1177, 1183 (S.D.N.Y.1990).

### III. *RELIANCE DAMAGES IN THIS CASE*

Cyberchron contends that the total of its expenditures with regard to the performance of the work induced by the Grumman promises and directives, less mitigation credits, are set forth in Plaintiff's Exh. 51, its "Summary of Damages," including expenses, and general and administrative overhead, in the total sum of $1,651,266.88.

On the other hand, Grumman contends that, even assuming liability under the promissory estoppel theory, the only arguable promise was made at the August 28, 1990 meeting. At that meeting, according to Grumman, there is evidence that a promise was made by Grumman that if Cyberchron delivered the equipment in accordance with its "best" schedule, Grumman would pay for the equipment. Grumman contends that the damages with regard to this promise can only cover expenditures incurred subsequent to August 28, 1990, which, according to Grumman, is the sum of $193,357.50, at most.

Initially, the Court rejects any claim by Cyberchron for administrative or engineering overhead as part of the reliance damages. Although Wilhelm testified that Grumman was willing to negotiate a price which included overhead, this was discussed solely in the light of a consummated contract.

Cyberchron tried to prove that its manufacturing overhead was 154% and its engineering overhead was 124%. Without commenting on the believability of this huge overhead claim, the Court finds that the plaintiff failed to prove that its general and administrative overhead should be included in the damages recoverable in the promissory estoppel cause of action. First, the Court finds that a substantial portion of these expenses would have been incurred by Cyberchron even without the Grumman order. For example, the salaries set forth in the schedule concededly include *all* employees of Cyberchron, whether or not they worked on the Grumman order. In addition, the overhead charged to Grumman includes rent, telephone and insurance costs which, with reasonably certainty, would have been paid by Cyberchron whether or not it did the Grumman job. Also, the pension charges would have been paid regardless of this transaction. Thus, the Court finds that the plaintiff failed to prove that these overhead expenses were specifically incurred for the Grumman transaction.

Second, the alleged overhead expenses were "for the six months ended June 30, 1990" and did not purport to set forth the

overhead expenses generated for the important period after July 15, 1990.

"Q  Is it correct that these rates reflected in Exhibit 43 were prepared for the six months ended June 30, 1990?

A  That's correct.

Q  Do you know what the period of performance of Cyberchron's performance of the contract for Calldata was?

A  I recall that it did fall into this period, yes.

Q  Mr. Elezovic, isn't it a fact that contract extended into August of 1990?

A  According to my recollection, yes.

Q  And so, these overhead rates did not apply in August of 1990, do they?

A  They apply for the period ending June 30.

Q  Mr. Elezovic, did these overhead percentages apply for August 1990?  Can you answer yes or no?

A  Not directly, no.

Q  Did you calculate any overhead rates for August of 1990?

A  No, we did not.

Q  Did you calculate any overhead rates for July of 1990?

A  No, I did not" (Tr. at pp. 548–549).

Third, the plaintiff failed to prove that such overhead expenses were proper "reliance expenses" recoverable in a promissory estoppel cause of action.  As stated recently by the Second Circuit in *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 334 (2d Cir.1993), "New York Law does not countenance damage awards based on speculation or conjecture."  On this record, the Court declines to award such questionable overhead expenses on the promissory estoppel cause.

Judy Kassel is the Cyberchron purchasing manager.  She testified that in connection with the Grumman job, the plaintiff purchased materials in the total sum of $417,695.51 covering the period from March 5, 1990 to September 14, 1990.  (Plaintiff's Exhs. 39, 40).  This figure included a reduction for materials that were returned to vendors.  As to the equipment purchased for the Grumman job, Ms. Kassel testified that Cy-

berchron tried to use it but "there was a lot of custom parts made for this job that is of no use to anyone" (Tr. at p. 334).

Based on the documentary evidence introduced by Cyberchron (including plaintiff's exhibits 40, 43, 46, 47, 48, 51, 53 and 54), the Court finds that the plaintiff established the following reliance damages between July 15, 1990 and September 25, 1990:

● Materials Purchased
(See Plaintiff's Exh. 40)

| | |
|---|---|
| July 15, 1990 to Sept. 14, 1990 | $ 53,588.40 |

(See detailed list marked as appendix A)

● Labor Cost Incurred
(See Plaintiff's Exh. 46, 47, 48, 51, 53, & 54)

| | |
|---|---|
| July 15, 1990 to Sept. 14, 1990 | $109,235.79 |

(See detailed list marked as appendix B)

Accordingly, the plaintiff Cyberchron established reliance damages for materials purchased in the sum of $53,588.40 and labor costs incurred in the sum of $109,235.79 resulting in total damages in the sum of $162,824.19.

## IV.  *PRE–JUDGMENT INTEREST*

Under New York Law, pre-judgment interest should begin to run "from the earliest ascertainable date the cause of action existed."  N.Y.CPLR § 5001(b).  In this case, the earliest ascertainable date the cause of action for promissory estoppel arose was the date on which Cyberchron requested payment for the material and labor costs.  In the absence of proof as to when such demand for payment was made, the Court fixes the interest accrual date at December 18, 1990, the date this action was commenced.

Accordingly, the Court awards pre-judgment interest at the rate of 9% per annum commencing on December 18, 1990.

For the reasons set forth above, the Clerk of the Court is directed to enter judgment in favor of the plaintiff Cyberchron against the

defendant Calldata Systems Development, Inc. in the sum of $162,824.19, together with interest at the rate of 9% per annum from December 18, 1990 to the date of the entry of judgment.

**SO ORDERED.**

## APPENDIX A
### MATERIALS PURCHASED BY CYBERCHRON
### FROM JULY 15, 1990 TO SEPTEMBER 25, 1990

| DATE | VENDOR | MATERIALS COST |
|------|--------|----------------|
| 7/17/90 | Custom Photo & Design | 33.00 |
| 7/18/90 | Marlac Electric, Inc. | 119.76 |
| 7/19/90 | Schweber Electronics | 32.00 |
| 7/23/90 | Digi Key Corp. | 352.80 |
| 8/02/90 | Apexx Omni Graphics | 274.00 |
| 8/09/90 | North Park Metal Workers | 1,304.00 |
| 8/09/90 | Doran Manufacturing Co. | 35,790.81 |
| 8/09/90 | Plastic–Craft Prod. | 393.75 |
| 8/10/90 | Jewel Precision | 743.75 |
| 8/10/90 | Electro Rent Corp. | 1,055.00 |
| 8/10/90 | Apexx Omni–Graphics | 116.00 |
| 8/13/90 | Dove Electronic Comp. Co. | 217.60 |
| 8/13/90 | Graphic Components | 860.00 |
| 8/16/90 | Help Electronics | 131.00 |
| 8/16/90 | Hamilton/Avnet Electric | 1,033.00 |
| 8/22/90 | Doran Manufacturing | 345.00 |
| 8/22/90 | Triangle Circuits of CT | 448.83 |
| 8/24/90 | Capstone Electronics | 196.52 |
| 8/29/90 | Arrow Electronics | 328.15 |
| 8/31/90 | Upstate Components | 115.43 |
| 8/31/90 | Custom Photo & Design | 202.80 |
| 9/05/90 | Photo Circuits | 137.17 |
| 9/07/90 | Ramp Industries | 1,482.00 |
| 9/12/90 | Techniques, Inc. | 1,961.40 |
| 9/13/90 | Ramp Industries | 3,821.13 |
| 9/14/90 | North Park Metal Workers | 1,297.50 |
| | Total Materials | $53,588.40 |

## APPENDIX B
### ENGINEERING AND MANUFACTURING LABOR COSTS
### BY CYBERCHRON FROM JULY 15, 1990 TO SEPTEMBER 25, 1990

| Week Ending | | Amount |
|-------------|--|--------|
| 7/15/90 to 7/20/90 (for 5 days only) * | Manufacturing (Pltfs.Exh. 46) | $ 2,000.00 |
| Period ending 8/03/90 | Manufacturing (Pltfs.Exh. 47) | $ 12,179.45 |
| | Engineering | $ 7,301.68 |
| Period ending 8/17/90 | Manufacturing (Pltfs.Exh. 47) | $ 15,693.77 |
| | Engineering | $ 9,920.33 |
| Period ending 8/31/90 | Manufacturing (Pltfs.Exh. 47) | $ 19,366.92 |
| | Engineering | $ 11,909.81 |
| Period ending 9/14/90 | Manufacturing (Pltfs.Exh. 47) | $ 12,952.72 |

| Week Ending | | Amount |
|---|---|---|
| | Engineering | $ 7,664.49 |
| Period ending 9/28/90 | Manufacturing (Pltfs.Exh. 48) (11/14th of $13,041.16 for the period between 9/14/90 and 9/25/90) | $ 10,246.62 |
| | TOTAL LABOR COSTS | $109,235.79 |

\* As adduced from Plaintiff's Exh. 46, the labor costs for five days from July 15, 1990 to July 20, 1990, is approximately $2,000.00.