**David A. KAPLAN, Plaintiff,**

v.

**Frances T. VINCENT, Jr., Defendant.**

**No. 95 Civ. 1871 (BDP).**

United States District Court,
S.D. New York.

Sept. 10, 1996.

308

· Audrey S. Feinberg, Irvington, NY, for Plaintiff.

Kim Sweet, Saul B. Shapiro, Patterson, Belknap, Webb & Tyler, New York City, for Defendant.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

The plaintiff, David Kaplan, a writer, has brought an action for a declaratory judgment seeking co-ownership rights in an unpublished manuscript of the memoirs of defendant, former major league baseball commissioner, Frances T. Vincent, Jr. In addition, Kaplan also seeks damages from Vincent arising out of Vincent's alleged breach of contract, fraud and unjust enrichment. Vincent moves to dismiss the complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P. In response, Kaplan cross-moves pursuant to Rule 56 Fed. R.Civ.P. for partial summary judgment, on his declaratory judgment claim.

### FACTS

**The Agreements**

This action stems from an arrangement between Kaplan, the legal affairs editor and senior writer for *Newsweek* magazine and Vincent to publish Vincent's memoirs. Underlying the principal factual contentions of this lawsuit are two alleged agreements concerning the publication of the book. The first, a Publishing Agreement, dated April 8, 1994, was signed by Kaplan and Vincent and Little, Brown and Company ("Little, Brown") in July 1994. The Publishing Agreement provided that Vincent and Kaplan, jointly referred to as "author", would submit the manuscript of Vincent's memoirs by January 2, 1995. The two were to receive an advance of $300,000, half of which, $150,000, was payable upon signing of the publishing agreement—before the manuscript was fully submitted. The other half was payable upon the submission of an acceptable manuscript.

Vincent contends that in addition to the Publishing Agreement, the terms of his working relationship with Vincent were also governed by a so-called collaboration agree-

ment between them. The existence and terms of this agreement are much less sharply defined. According to Kaplan, however, the only agreement the two ever reached took place in December 1992 when they agreed orally that they would share credit on the book and that they would split any income and expenses from the book 60/40 with 60 percent going to Vincent. Vincent, on the other hand, contends that the two had a far more elaborate understanding. Not only did the collaboration agreement entail the very basic terms as framed by Kaplan, but, according to Vincent, at this time the two also agreed that Vincent would have (1) control over the final manuscript; (2) the right to terminate their agreement at any time for any reason; and (3) the right to prevent Kaplan's use of Vincent's contributions to the project. Moreover, Vincent also contends that the two agreed to extensive terms and obligations set forth in written drafts of their Collaboration Agreement that they exchanged between May and November 1994. Since this agreement was never reduced to a final writing, the issue here is whether the parties are nevertheless bound.

**The Project**

According to Kaplan, he began working on the book long before he and Vincent signed the Publishing Agreement. The two first discussed the idea of a book about baseball in September 1992, and over the next few months, they casually discussed chapter topics and ideas for titles. In February 1993, recovering from back surgery, Vincent moved to England and put the project on hold. When Vincent returned that summer, he told Kaplan that he would go forward with project, and the two then signed with the William Morris Agency to represent them in finding a publisher. According to Kaplan, from June 1993 through February 1994, he spent "hundreds of hours" drafting a 42 page proposal—at the request of William Morris and Vincent. Apparently, however, the contents of the proposal, although confidential, were published in the sports section of *The New York Times*. Eventually, Vincent began to experience misgivings about the project and at one point told Kaplan he no longer wanted to go through with the book.

However, after a weekend, he changed his mind and accepted Little, Brown's offer.

It was also during this time period that Kaplan and Vincent began working on the manuscript itself. Kaplan claims that he conducted over 45 hours of taped interviews of Vincent, reviewed Vincent's archived files, researched newspaper and magazine articles, interviewed Vincent's former employees and drafted the manuscript, while Vincent sat for the interviews and did some of the editing. By November 23, 1994, Kaplan had completed 90 percent of the work, including final versions of three quarters of the chapters. On that day, November 23, 1994, Vincent called Kaplan to say that he no longer wanted to work on the book. He returned the entire $150,000 to Little, Brown, but permitted Kaplan to keep his $60,000 share of the advance. The collaboration agreement was never signed.

## DISCUSSION

### I. The Declaratory Judgment Claim

In his fourth claim, Kaplan seeks a declaration, pursuant to 28 U.S.C. § 2201 that he has the right to publish and use the materials at issue without Vincent's permission. Vincent moves to dismiss this claim pursuant to Rule 12(b)(6) on the theories that Kaplan is precluded from publishing the manuscript since no valid enforceable contract exists, or, alternatively, that Kaplan may not publish the materials based on promissory estoppel. Kaplan cross moves for summary judgment on this claim, arguing that, as a co-author of the manuscript, he has the right to publish based on Sections 102 and 201 of the Copyright Act, 17 U.S.C. §§ 102; 201 (1977). We consider each of these contentions in turn.

### A. Vincent's Motion

#### 1. Legal Standard

A complaint must be dismissed under Fed. R.Civ.P. 12(b)(6) only if "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see also *Easton v. Sundram*, 947 F.2d 1011, 1014 (2d Cir.1991), *cert.*

*denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). In addition, in deciding a motion to dismiss, the court must read the facts alleged in the complaint "generously" drawing all reasonable inferences in favor of the party opposing the motion. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The trial court's role is to appraise the legal merits of the complaint and not to weigh the evidence which might be introduced at trial. See *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991) (plaintiff is not compelled to prove her case at the pleading stage). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Finally, the trial court should grant a Rule 12(b)(6) motion "only if is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02).

### 2. The Collaboration Agreement

■ Vincent argues that Kaplan is precluded from publishing any of the materials because the two agreed not to in 1992. In support of this contention, Vincent claims that he told Kaplan that, since he was the main source for the book, he retained the final say on what use could be made from any of the information he divulged to Kaplan. Kaplan, according to Vincent, agreed.

Essentially, this meant that Vincent could terminate the project at any time for any reason without concern that Kaplan would exploit information that he shared with him. Vincent contends that Kaplan's promises are reflected repeatedly in the drafts of the collaboration agreement that the two exchanged between May 13, 1994 and November 23, 1994. Vincent notes, that pursuant to paragraph 13(a) of the July 6, 1994, August 4, 1994, August 23, 1994, August 26 1994, October 19, 1994 and November 23, 1994 drafts of the collaboration agreement, he was entitled to terminate the project at any time. Paragraph 13(a) provides:

> Vincent may terminate this agreement or discontinue working on the book at any time, for any reason, without the consent of Mr. Kaplan, provided that in such event Vincent shall be responsible for returning to the Publisher the monies theretofore paid by the publisher to Kaplan, as well as those paid to Vincent in the event these must be repaid. If such a termination occurs after Kaplan has prepared the entire text of the manuscript, Vincent shall also pay to Kaplan all additional monies that would become due to Kaplan from the Publisher as advances under paragraph 8 of the Author–Publisher Agreement upon delivery of a final, acceptable manuscript for the Work, provided the Publisher certifies that the manuscript is acceptable to it.[1]

Vincent also argues that pursuant to ¶ 14(a), Kaplan is prevented from publishing the materials in the event of a termination. Paragraph 14(a) provides:

> In the event there is any termination, any written material or manuscripts shall revert to and revest in such contributing party with the result that neither party shall be permitted to use the materials contributed by the other without such others written permission.[2]

Kaplan's position on these draft agreements is that no binding promises had been made and that he did not intend to be bound

---

1. Kaplan included similar language in paragraph 17(b) of the first draft of the collaboration agreement. The May 13 version provided:
   > Vincent may terminate this agreement or discontinue working on the book at any time, for any reason, without the consent of Mr. Kaplan. If that happens and, as a result, the Publisher requests that money be returned to the publisher, then Vincent shall be responsible for returning any money previously paid by the Publisher to Vincent and Kaplan ...

2. Kaplan included similar language in paragraph 17(c) of the first draft of the collaboration agreement. The May 13 version provided:
   > In the event of any termination, any written material or manuscripts shall revert to them both and neither shall be entitled to use any contributions without the written consent of the other.

in the absence of a formal, executed written agreement.

Moreover, Vincent, some time after he received Kaplan's first draft, added a confidentiality clause which specifically prohibits Kaplan from disclosing information provided by Vincent without Vincent's consent. That clause, found in paragraph 14(b) of the July 18 1994 draft, provides:

All material whether oral or written contributed by either party for use in the manuscript, including materials and information provided prior to the execution hereof, shall be considered confidential, and neither party shall use any of such material or the facts or the information contained therein that have been provided with the parties' collaboration except as permitted hereunder or under an agreement with a third party to which both parties have previously agreed in writing, without the express prior written approval of the other party. In no event shall any confidential material otherwise be used by the party that has not furnished the same in the event there is any termination of the agreement. Specifically, Kaplan agrees not to participate in interviews, write any articles or books, or take any actions in or by which he discloses in any manner any of the unpublished information furnished to him hereunder, or any portion thereof, in connection with the work which is not publicly available or independently discovered by Kaplan, including any non-public aspect of the relationship of the parties involved in the preparation or the writing of the Work and/or its adaptation for use in any media whatsoever ...

■ The controversy here is whether this exchange of drafts constitutes an enforceable contract since, under New York law, a contract is unenforceable if the parties did not intend to be bound except by a formal written agreement. *Totalplan Corporation of America v. Colborne,* 14 F.3d 824, 831 (2d Cir.1994); *Jim Bouton Corp. v. Wm.*

*Wrigley Jr.,* 902 F.2d 1074, 1080 (2d Cir. 1990), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *Winston v. Mediafare Entertainment,* 777 F.2d 78, 80 (2d Cir.1985). "This rule holds true even if the parties have orally agreed upon all terms of the proposed contract." *R.G. Group, Inc. v. Horn & Hardart,* 751 F.2d at 74. On the other hand, where the parties do not intend that an agreement must be reduced to writing to be binding, and there are no material terms of the contract left open for negotiation, an informal oral agreement may be binding even if the parties contemplate memorializing their agreement in writing. *Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568 (2d Cir.1993); *Winston,* 777 F.2d at 80; *R.G. Group,* 751 F.2d at 74. Thus, what matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances. *R.G. Group,* 751 F.2d at 74. When a party "gives forthright reasonable signals that it means to be bound only by a written agreement, that intent should be honored." See *R.G. Group,* 751 F.2d at 74. If, however, the parties' expressions and conduct would lead a reasonable person to conclude that they intended to reach a binding agreement, the agreement is enforceable. See *Reprosystem, B.V. v. SCM Corp.,* 522 F.Supp. 1257, 1275 (S.D.N.Y.1981), *aff'd in part and rev'd in part,* 727 F.2d 257 (2d Cir.1984).

■ We generally consider four factors in determining whether parties intend to be bound absent a writing. These are: "(1) whether the parties expressed to one another that they would be bound only by a written agreement; (2) whether there has been partial performance of the contract and that partial performance has been accepted; (3) whether all of the terms have been agreed upon and there is nothing left to negotiate; and (4) whether the agreement is the sort that is usually written." *Shearson Lehman CMO, Inc. v. TCF Banking & Sav., F.A.,* 710 F.Supp. 67, 70 (S.D.N.Y.1989).[3] These fac-

**3.** In *Consarc.,* supra, our Court of Appeals recognized a more exhaustive "unrefined" set of factors to be included in the analysis: (1) the number of terms agreed upon compared to the total number to be included; (2) relationship of the parties; (3) degree of formality attending similar contracts; (4) acts of partial performance by one party accepted by the other; (5) usage and custom of the industry; (6) subsequent conduct and interpretation by the parties themselves; (7)

tors may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." *Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 80 (quoting Restatement (Second) of Contracts § 27 comment c (1981)). No single factor is decisive. *Consarc. Corp.*, 996 F.2d at 576. Addressing each of these factors in turn, the Court concludes that the record before this Court does not establish that the parties intended to be bound to the agreement prior to the execution of a writing, and thus the exchange of drafts does not establish a dispositive defense to Kaplan's declaratory judgment claim.

As for the first factor, there is some documentary evidence that the two intended only to be bound by a signed writing. Not only do the drafts include an execution page, but the latest draft that was mailed to Nicole Seligman, counsel to Vincent, was attached to a cover letter from Roger Zissu, counsel to Kaplan, which stated:

> I made the changes you noted. I am sending a set of duplicates for execution.

This cover letter in this case resembles the one in *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970). There, plaintiff George Scheck, who had been working for many years as the business manager for the popular singer Connie Francis, was negotiating a new contract for Francis. His earlier employment agreement had expired a year before; hence like Kaplan, Scheck was working for some time without a signed writing reflecting the terms of his employment. During the course of negotiations, Marvin Levin, Francis's attorney, submitted several drafts of proposed contracts to Scheck, all of which were rejected. After a "final negotiation session," Levin, mailed Scheck four copies of the new agreement with a cover letter instructing the plaintiff "to sign all copies" and "have Connie sign all copies." *Scheck,*

311 N.Y.S.2d at 842, 260 N.E.2d at 494. Scheck signed the copies promptly and forwarded them to Francis who never signed. *Scheck,* 311 N.Y.S.2d at 842, 260 N.E.2d at 494. Nonetheless, Scheck continued to work for Francis for almost a year, after which he learned that no written contract existed.

The New York Court of Appeals found that the cover letter, which like the cover letter from counsel here, required both parties to sign and thus "evidenced the intention of the parties not to be bound until the agreements were signed ... It appears quite clear, from [the attorney's letter alone], that the agreements were to take effect only after both parties had signed them." *Scheck,* 311 N.Y.S.2d at 843, 260 N.E.2d at 494; see also *Arcadian Phosphates Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2nd Cir.1989) (" 'more is needed than agreement on each detail [to create a binding obligation. There must be overall agreement] ... to enter into a binding contract.' "). Thus, the court in *Scheck* held that the unsigned agreement was unenforceable even though negotiated by the parties.

Other cover letters also suggest that Kaplan intended to be bound only by a signed writing. In a letter accompanying the July 27 draft, Zissu notes that except for the initial advance, "Kaplan would be without financial protection up to the point of manuscript completion ... If Vincent pulls out before the point of completion, simply because he decides to, i.e. not for cause, then Kaplan will not have financial protection. (I'm advised that David is well into his work without regard to our drafting and execution of the collaboration agreement)." Zissu reiterated these concerns in letters accompanying his August 23 and October 19 drafts. These concerns strongly suggest that Vincent was made aware that Kaplan did not intend the agreement to be binding until it

whether writing is contemplated merely as a "memorial"; (8) whether contract needs formal writing for its full expression; (9) whether any terms remain to be negotiated; (10) whether contract has few or many details; (11) whether amount is large or small; (12) whether a standard form is widely used in similar transactions or whether this is an unusual type of contract; (13) the speed with which the transaction is

concluded; (14) the simplicity or complexity of the transaction; (15) the availability of information necessary to decide whether to enter into a contract; (16) the time when the contract was entered into. See *Consarc,* 996 F.2d at 575 (citing Restatement (Second) of Contracts § 27 cmt. c (1981)); 1 Samuel Williston, A Treatise on the Law of Contracts.

was fully executed. See *Stetson v. Duncan,* 707 F.Supp. 657, 666 (S.D.N.Y.1988).

Language in the draft contract itself suggests that the parties intended to be bound by a signed writing. In July, Seligman added the following language to Kaplan's draft [4]:

This agreement together with the author publisher agreement states the entire agreement between the parties with respect to the subject matter herein contained and supersedes all prior written or oral understandings and agreements relating thereto and shall not be modified, amended or terminated except in writing signed by both parties. [5]

We give this draft provision considerable weight. See *R.G. Group Inc.,* 751 F.2d, 69, 73 ("a no modification clause is evidence the parties intended a signed writing, even given a telephone acknowledgement of a handshake deal.").

We turn to the second factor—whether one party's partial performance of the alleged contract and the other party's acceptance of that performance indicates that the parties understood a contract to be in effect. *R.G. Group Inc.* 751 F.2d at 76; see also *Winston,* 777 F.2d at 80 (partial performance "is strong circumstantial proof that the minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument.").

Both sides agree that there was partial performance of the collaboration agreement because Kaplan had apparently completed ninety percent of the manuscript. However, we are not persuaded that this factor should be determinative. First, Kaplan was obligated under the publishing agreement to submit the manuscript to Little, Brown no later than January 2, 1995, and so it is unclear from the facts the extent, if any, to which Kaplan performed under the collaboration agreement more than was required under the Publishing Agreement.

The third factor is whether there was "literally nothing left to negotiate or settle, so that all remained to be done was to sign what had been fully agreed to." *R.G. Group,* 751 F.2d at 76. See *Totalplan,* 14 F.3d at 832 ("the circulation of the varying drafts throughout the spring ... indicates that no binding agreement had been reached and the terms were still under negotiation."). The evidence does not indicate that the parties were in agreement as to all of the terms. For example, throughout his papers, Vincent contends that in 1992, long before the collaboration agreement was memorialized in writing, the parties agreed to its basic terms. However, the confidentiality provision, a significant issue in this lawsuit, found in Paragraph 14(a), did not appear in the May draft of the agreement. This suggests that the parties continued to negotiate basic terms of their agreement more than a year after they allegedly entered into an oral agreement. Moreover, even though it appears that the parties had made significant progress during the May and November period in drafting a document that was acceptable to both of them, the documents alone do not establish conclusively that the November draft was essentially a final draft.

Finally, we must determine whether the proposed agreement concerns a complex transaction which as a practical business matter would be normally reduced to writing. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 83. Kaplan asserts that a written collaboration agreement is the norm in the publishing world, and in support, he offers several sample collaboration contracts. Moreover, Kaplan notes that the $300,000 advance indicates the complexity of the transaction. Kaplan's contentions lose some force in light of the January 1995 deadline for a first draft set forth in the Publishing Agreement. Moreover, Vincent contends that because he and Kaplan were friends, he did not believe a formal agreement was necessary.

---

**4.** This language appears in Paragraph 18 in the subsequent drafts.

**5.** Kaplan included similar language in paragraph 17(b) of the first draft of the collaboration agreement. The May 13 version provided:

this agreement constitutes the entire understanding of both parties and may not be changed except by written agreement.

In sum, in light of the fact that the drafts and the parties' correspondence clearly establish an intent to be bound by a written contract[6]; the ambiguity as to whether terms were left open and the weakness of the evidence as to the industry practice, we are not persuaded that Kaplan and Vincent were bound by an oral contract, and thus we deny Vincent's motion to dismiss, pursuant to Rule 12(b)(6) on these grounds.

### 3. Promissory Estoppel

Vincent alternatively argues that Kaplan is precluded from publishing the materials under the doctrine of promissory estoppel. In New York, promissory estoppel may apply where there is "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and injury sustained by the party asserting the estoppel by reason of his reliance." *Totalplan*, 14 F.3d at 832 (citing *Esquire Radio & Electronics v. Montgomery Ward*, 804 F.2d 787, 793 (2d Cir.1986)).

To establish a claim based on promissory estoppel, a party must prove: (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance. *Cyberchron Corp. v. Calldata Systems Development*, 47 F.3d 39 (2d Cir.1995); *Totalplan*, 14 F.3d at 833; *Arcadian Phosphates Inc. v. Arcadian Corp.*, 884 F.2d at 73.

According to Vincent's affidavit, he insisted that his participation in the book project was conditioned upon Kaplan's promise that Vincent would be able to terminate the collaboration at any time for any reason, and that Vincent would be able to prevent publication and other use of the contributions he had made to the project.

We are unable to conclude at this stage in the litigation whether, as a matter of law, Kaplan made a clear and unambiguous promise to Vincent. Moreover, Vincent avers that he reasonably relied on the alleged promise

in revealing his confidences to Kaplan during the interviews. Because we find that material issues of fact exist concerning whether Kaplan made an unambiguous promise to Vincent and whether Vincent reasonably relied on that promise, we deny Vincent's motion to dismiss based on this theory.

### B. Kaplan's Motion

In his cross-motion for partial summary judgment, Kaplan seeks a declaration that he has the right to use the material obtained during the collaboration between the parties.

### 1. Standard For Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, "a motion for summary judgment must be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); see also *Gallo v. Prudential Residential Servs. Ltd*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party must meet a burden of coming forward with "specific facts, showing that there is a genuine issue of fact for trial," Fed.R.Civ.P. 56(e) by a showing sufficient to establish the existence of [every] element essential to the party's case, and on, which the party will bear the burden of proof at trial.

In deciding whether a genuine issue of material fact exists, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). The Court is to inquire whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

---

**6.** In *Stetson*, 707 F.Supp. at 668, supra, where the evidence "so plainly establishes an intent not to have been bound prior to signature," the court found it unnecessary to further examine the four factor test.

(1986), however, and to grant summary judgment where the nonmovant's evidence is merely colorable conclusory, speculative or not significantly probative. *Knight v. United States Fire Ins.*, 804 F.2d 9, 12–15 (1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### 2. Section 201 of the Copyright Act

■ Kaplan argues that as a co-author of the manuscript, he has the right to publish without Vincent's permission. Both parties appear to agree that this would be so only if Kaplan qualifies under the Copyright Act ("the Act") as a joint author of the material. The Act provides that authors of a joint work are joint owners of a copyright in the work. See 17 U.S.C.A. § 201(a); see also *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir.1991). This is so despite any differences in the quality or quantity of each author's contribution. 17 U.S.C. § 102. Hence, each author maintains the right to use or license the work, subject only to an accounting to the other co-owner. *Childress*, 945 F.2d at 505; *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir.1994). The Act defines a "joint work" as:

> a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

The Copyright Act, 17 U.S.C.A. § 101 (1977).

■ In attempting to establish that a work is a joint one, it is not sufficient that the authors simply collaborated with each other. Rather, the party seeking to demonstrate joint authorship must establish that each author intend that their respective contributions be merged into a unified work. As our Court of Appeals has observed:

> The wording of a statutory definition appears to make relevant only the state of mind regarding the unitary nature of the finished work—an intention 'that their contributions be merged into inseparable or interdependent parts of a unitary whole.' However, an inquiry so limited would extend joint author status to many persons

who are not likely to have been within the contemplation of Congress ... What [determines] the ... true joint author relationship is the ... intent of *both* participants in the venture to regard themselves as true authors.

*Childress*, 945 F.2d at 507 (emphasis added). See also *Trinity*, 13 F.3d at 1068. Indeed the Committee Report states:

> [A] work is joint if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit ...

See *Childress*, 945 F.2d at 505, *citing*, H.R.Rep. No. 1476, 94th Cong.2d Sess. 120, U.S.Code Cong. & Admin.News pp. 5659, 5735.

■ Vincent does not dispute that both he and Kaplan participated in the collective creative process; rather he asserts that he did not intend them to be joint authors. Two factors are helpful in determining whether the parties shared the requisite intent. First, we determine whether in the absence of a written contract, each party intended that all parties would be identified as co-authors. We then examine how the parties regarded themselves in relation to the work. See *Childress*, 945 F.2d at 508.

■ While here where no binding written contract between these parties exists, the contract drafts provide some evidence of the parties' intent. See *Childress*, 945 F.2d at 509 (District Court properly relied on contract negotiations in determining the intent of the parties). Kaplan adverts to a paragraph 2, contained in several versions of the unsigned drafts, which provides:

> The Work shall be a joint one within the meaning of Section 201 of the Copyright Act and, subject to the terms and conditions herein, shall be co-owned by Vincent and Kaplan as co-owners therewith.[7]

---

7. Kaplan included the following language in paragraph 2 of the May 13, draft:

All copyrights, renewals (and extensions thereof) connected to the Book shall be obtained in

Nevertheless, the drafts also provide support for Vincent's contention that the parties did not intend that they would be joint authors. For example, Vincent added the language found in paragraph 8 of the collaboration agreement which provided that Vincent had the right to exercise complete, final and sole control over the work. Moreover, as discussed earlier, paragraph 14(a) of the draft agreement provided that if any party were to terminate, "the copyright ownership of the material provided by each party shall revert to and revest in the contributing party with the result that neither party shall be permitted to use the materials contributed by the other without such others written permission." Paragraph 14(b) included the confidentiality clause which required that Kaplan could not use any of the materials provided by Vincent without his permission. Significantly, as noted above, these clauses were not even included in the Kaplan's initial draft but were added during negotiations. These additions provide some significant support for Vincent's position that he did not contemplate becoming a joint author.

As for how the parties regarded themselves, it is clear, that Vincent, in some respects, conceived that at some point in the future, he and Kaplan would be co-authors. The Publishing Contract, for example, which he signed in April, 1993 names both Vincent and Kaplan as authors. Similarly, the 1994 Little, Brown spring/summer catalogue promotes the upcoming book as authored "by Fay Vincent and David Kaplan." See *Childress*, 945 F.2d at 508 ("billing or credit may be evidence of intent to create a joint work"); *Trinity*, 13 F.3d at 1072 (same). Moreover, according to Kaplan during the collaboration period, Vincent sat for interviews, told stories and made a few editing changes, while Kaplan did virtually all of the writing of the book. Given this conflicting evidence as to the parties' intentions as to joint authorship at this stage in the litigation, we are unable to resolve Kaplan's claim for declaratory judgment. Accordingly, on the record before us, we deny Kaplan's motion for a summary declaratory judgment. Likewise, we deny

the names of Vincent and Kaplan, and shall be

Vincent's motion to dismiss based on this theory.

## II. The Contract Claim

■ Kaplan also asserts a claim against Vincent for breach of contract in connection with the Little, Brown publishing agreement. The Publishing Agreement, however, does not obligate Kaplan and Vincent to each other but rather defines their obligations to Little, Brown as publisher. In fact, as Vincent notes, that Agreement does not make any distinctions between Vincent and Kaplan but instead refers to them jointly as author. As such, we find no basis for Kaplan's breach of the Publishing Agreement under this theory.

■ Alternatively, Kaplan asserts that he is a third party beneficiary to the Publishing Agreement. This claim also lacks merit. To recover for damages as a third party beneficiary, a plaintiff must first establish that he is not a party to the contract. As noted above, however, Kaplan, along with Vincent, is a direct party to the contract and thus that theory is not available to him. See *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir.1991). Accordingly, we dismiss Kaplan's claim for breach of contract on this basis.

## III. Quantum Meruit

In count two of his complaint, Kaplan contends that by spending over 2,000 hours in interviewing, researching, writing, and editing, he should be compensated in quasi contract for quantum meruit. A quasi contract "is not really a contract at all but rather a legal obligation imposed to prevent a party's unjust enrichment." See *Clark–Fitzpatrick v. Long Island Rail Road*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). As stated by the New York Court of Appeals:

"Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort. The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy ... Briefly stated, a quasi-contractual obligation is one imposed

owned jointly by them.

by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved. The law creates it, regardless of the intention of the parties to assure a just and equitable result."

*Bradkin v. Leverton,* 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970).

■ To state a claim for quantum meruit: Kaplan must establish (1) plaintiff's performance of services in good faith; (2) acceptance of the services by the persons to whom such services were rendered; (3) expectation of compensation; and (4) the reasonable value of such services. See *Paper Corp. of United States v. Schoeller Technical Papers,* 773 F.Supp. 632, 640–41 (S.D.N.Y.1991).

Vincent contends that there is nothing in the complaint which suggests that Kaplan had a reasonable expectation that Vincent would compensate him for services rendered or that Vincent made statements to Kaplan that would support such an expectation. In his affirmation, Kaplan explains that in April 1994, just before signing the Publisher Agreement he told Vincent that "it was decision time, that he needed to resolve his ambivalence and see if he really wanted to do the book." Apparently Vincent told Kaplan that "he agreed and that he really wanted to do the book and assured [Kaplan] in the strongest language that he was committed to doing the book." Vincent further argues, however, that to succeed on this claim, Kaplan must establish that he expected compensation from Vincent himself, not from Little, Brown. See *Nemani v. United Health Servs. Inc.,* 170 A.D.2d 782, 565 N.Y.S.2d 877, 880 (3d Dept.), *appeal dismissed,* 78 N.Y.2d 1007, 575 N.Y.S.2d 457, 580 N.E.2d 1060 (1991). The factual record, at this stage of the proceedings, does not permit resolution of this aspect of Kaplan's quantum meruit claim.

Vincent, however, raises another defense to the quantum meruit claim, namely, that recovery in quantum meruit is unavailable where an express contract governs the subject matter. Here, Vincent refers to the clause in their agreement which provides that a unilateral termination by Vincent would require Vincent to return the $150,000 advance to Little, Brown, thereby enabling Kaplan to retain his $60,000 of the advance. However, because we have held that, as a matter of law, there is no binding contract, Vincent cannot avail himself of this defense.

■ Nevertheless, we find that Kaplan's claim for quantum meruit fails for two reasons: first, Vincent was not unjustly enriched by any work done by Kaplan; and second, Kaplan failed to fully perform on its part. *Cyberchron Corporation v. Calldata Systems Development,* 831 F.Supp. 94 (E.D.N.Y.1993).

Kaplan argues that under the theory of "constructive benefit" Vincent received the requisite benefit from his work. In *Farash v. Sykes Datatronics,* 59 N.Y.2d 500, 465 N.Y.S.2d 917, 452 N.E.2d 1245 (1983), the New York Court of Appeals recognized that the "actual benefit" to the defendant need not be direct, nor need it be a direct economic benefit. However, even in cases where the plaintiff did not directly confer a benefit on the defendant, the plaintiff still must have actually performed. See *Cyberchron,* 831 F.Supp. at 110. Receipt, under New York law, is a legal concept rather than a description of a physical fact. However, incomplete acts merely preparatory to performance are not sufficient. Here, Kaplan did not produce a complete manuscript. Instead, allegedly induced by Vincent's representations, Kaplan took an unpaid leave from *Newsweek* and dedicated his time to the manuscript. Kaplan continued to work without a contract, taking a chance that he and Vincent would finish the book and that Little, Brown would accept it, and pay them for it. Neither of these events occurred.

In view of the lack of benefit to Vincent and the failure of Kaplan to fully perform, we find quantum meruit not applicable here. Since there was no unjust enrichment to the Vincent nor full performance by Kaplan, we dismiss this claim.

## IV.  Fraud Claim

In the third count of his complaint, Kaplan alleges that Vincent fraudulently induced him to work on the manuscript by promising that he was committed to completing the project,

even though he was not actually committed to it. Kaplan further alleges that in reliance on those statements, he took unpaid leave from *Newsweek* magazine and spent over 2,000 hours working on the book.

■ To state a claim for fraud in the inducement under New York law, Kaplan must prove: (1) that Vincent made a misrepresentation; (2) as to a material fact; (3) which was false; (4) and known to be false by Vincent at the time it was made; (5) that the misrepresentation was made for the purposes of inducing Kaplan to rely on it; (6) that Kaplan did so rightfully rely; (7) in ignorance of its falsity; (8) to Kaplan's injury. See *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987) (citations omitted).

■ Vincent argues that Kaplan's complaint fails to plead justifiable reliance. He argues that Kaplan clearly was not justified in relying on the alleged misrepresentations. In support Vincent relies on allegations in the complaint that in March 1994 before he and Vincent signed the Publishing Contract, Vincent temporarily backed out of the project. The complaint also alleges that in October 1994, Vincent told Kaplan that he had advised the chief executive officer of Time, Warner that he would drop the book project if it interfered with any of his potential responsibilities on the Time Warner board. Additionally, Vincent notes that Kaplan knew from the drafts of the collaboration agreement that he had expressly given Vincent the right to terminate the project at any time. In his complaint, however, Kaplan, also alleges repeated promises by Vincent that he fully intended to go through with the book. Accordingly, given Kaplan's allegations and the standards which govern a 12(b)(6) motion, we believe that Kaplan's complaint adequately alleges reasonable reliance.

■ As an alternative basis for dismissal, Vincent argues that Kaplan fails to state a fraud claim because the allegations of fraud amount to nothing more than a charge that Vincent promised to perform under the Publishing Agreement and the collaboration agreement. Under New York law, a promise made with a preconceived and undisclosed intention not to perform can support a fraudulent inducement claim as long as the promise is secondary to the terms of the contract. *Chromagrafx*, 873 F.Supp. 786, 796 (E.D.N.Y.1995) citing *Deerfield Communications Corp. v. Chesebrough–Ponds*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986); *Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir.1992); see also *Papa's–June Music, Inc. v. McLean*, 921 F.Supp. 1154 (S.D.N.Y 1996) ("to maintain a claim for fraud a plaintiff must alleges a legal duty separate and apart from the contractual duty to perform") (citations omitted); *Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958).

We find that the complaint alleges a fraud claim that is sufficiently distinct from any viable contract claim. As noted above, Kaplan has failed to state a claim against Vincent under the Publishing Agreement. Moreover, Kaplan does not aver, and, in fact, specifically denies, that he has any rights under the Collaboration Agreement. Accordingly Vincent's motion to dismiss the fraud claim is denied.

## CONCLUSION

In conclusion, for the reasons stated, the Court grants Vincent's motion to dismiss plaintiff's claim for breach of contract and quantum meruit and denies his motion to dismiss plaintiff's claim for a declaration and for fraud. Additionally, the Court denies plaintiff's motion for partial summary judgment.

**SO ORDERED.**